CITY OF SHEBOYGAN, Plaintiff-Respondent,

v.

Brian J. CESAR, Defendant-Appellant.†

Court of Appeals

*No. 2009AP3049. Submitted on briefs October 18, 2010.*
*—Decided November 24, 2010.*

2010 WI App 170

(Also reported in 796 N.W.2d 429.)

† Petition for Review denied 3-15-11.

761

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Andrew Mishlove* of *Law Offices of Andrew Mishlove*, Glendale.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Charles C. Adams* of *City of Sheboygan City Attorney's Office*, Sheboygan.

A nonparty brief was filed by *James M. Freimuth*, assistant attorney general, and *J.B. Van Hollen*, attorney general for the Wisconsin Department of Justice.

Before Brown, C.J., Neubauer, P.J., and Anderson, J.

¶ 1. NEUBAUER, P.J.[1] Brian J. Cesar appeals from a judgment of conviction for operating while under the influence of an intoxicant (OWI), contrary to a City of Sheboygan ordinance adopting Wis. Stat. § 346.63(1)(a), and the "hit and run" of property adjacent to a highway, contrary to Wis. Stat. § 346.69. Cesar challenges the trial court order denying his motion to suppress evidence which he claims resulted from an unlawful stop and detention. Cesar contends that he was unlawfully seized within his home, and that his subse-

---

[1] The chief judge of the court of appeals converted this from an appeal decided by one judge to a three-judge panel by order dated August 24, 2010. *See* Wis. Stat. Rule 809.41(3) (2007–08). All references to the Wisconsin Statutes are to the 2007–08 version unless otherwise noted.

quent statements to the police were involuntary. We reject Cesar's challenges. We conclude that both Cesar's exit of his home and his statements to the police were voluntary. We uphold the trial court's order denying Cesar's motion to suppress and affirm the judgment.

## FACTS

¶ 2.  On December 20, 2006, Cesar was issued a citation for OWI, first offense, and the "hit and run" of property adjacent to a freeway. Cesar was found guilty of the cited offenses in municipal court. He then appealed to the trial court, demanding a trial de novo. Cesar subsequently filed a motion to suppress evidence on grounds that the initial stop and detention were unlawful because he was inside his residence when he was ordered out to discuss a vehicle striking a fire hydrant and the officer lacked reasonable suspicion to detain him. Cesar additionally moved to suppress statements he made to the police on grounds that such statements were made while in custody and before his *Miranda* rights[2] were read to him.

¶ 3.  The facts and circumstances underlying Cesar's arrest and detention were testified to at the suppression hearing and court trial. City of Sheboygan police officer, Brian Bastil, testified that on December 20, 2006, at approximately 10:00 p.m., he responded to a call that a vehicle struck a fire hydrant at Calumet and Sibley Court and then proceeded westbound on Sibley, turning into a driveway. When Bastil arrived at that location, he observed a fire hydrant that was knocked over and spoke to the reporting witness. He then proceeded down the block and located the pickup truck that matched the witness's description and had

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

damage consistent with having hit a fire hydrant. Police observed a broken beer bottle on the ground outside the vehicle. The truck was determined to be registered to Cesar, who resided at the address where it was parked.

¶ 4.   Three uniformed police officers were on the scene; two attempted to make contact with Cesar by knocking on the front door and one was posted at the back door. The officers rang the doorbell "numerous times" and knocked "numerous times" on the door and windows during a five- to ten-minute period. The officers were also taking turns looking in the windows of the residence and were able to see an individual in the kitchen. The individual looked at the officers through the window but did not respond. The officers identified themselves as police and "shouted" that they wanted to speak with him. Bastil advised Cesar that "it would be in his best interest to come out and just talk to [him] and get it taken care of." The officers continued to knock and eventually the individual came to the front window.

¶ 5.   Speaking through the window, Cesar identified himself and asked, "What do you want?" The officers responded that they needed to speak to him regarding an accident that had been reported down the block. Bastil recalled Cesar responding that he was not coming out of his house, and Bastil's written report reflects that Cesar also told the officers that he did not wish to speak to them. A "back and forth" ensued for "several minutes" about whether Cesar was willing to come out of his residence to speak to the officers or whether the officers would need to obtain a warrant.[3] The officers advised Cesar that they "were going to stay

---

[3] When asked how long the exchange between Cesar and Bastil lasted after Cesar initially said, "I'm not coming out and speaking with you," Bastil estimated "approximately five minutes." Bastil testified that during those five minutes, he and

there until either [they] applied for a search warrant or he came out and talked with [them]."[4]

Bastil observed that Cesar was "unsteady" during this exchange and he believed Cesar to be "under the influence of something."

¶ 6. Cesar eventually exited the residence and conversed with the police on his front porch for three to four minutes. During that conversation, Cesar stated that he had driven the truck, that he had just returned

---

Cesar "[b]asically ... spoke about [Cesar] coming out and speaking with us." When asked whether they were "persuading [Cesar] to change his mind and come out and speak with [them]," Bastil responded in the affirmative.

[4] Bastil testified as follows:

[DEFENSE COUNSEL:] You told [Cesar] that this wasn't going to end until he cooperated with you or words to that effect, correct?

[BASTIL:] Correct. It was—this wasn't going to go away, this complaint, that he needed to cooperate and it would be easier.

[DEFENSE COUNSEL:] And you were on his porch knocking and looking in the window and things like that for about—

[BASTIL:] Yes.

[DEFENSE COUNSEL:]—15 minutes before you actually made personal contact with him, correct?

[BASTIL:] That could be about the time, correct.

One of the other two officers at the scene, Officer John Rupnick, testified as follows:

[DEFENSE COUNSEL:] To summarize it, it would be fair to say that you were on that front porch knocking and trying to gain Mr. Cesar's cooperation for about 15 minutes before he came to the window?

[RUPNICK:] That would be fair to say, yes.

[DEFENSE COUNSEL:] And saying various things to him in order to induce him to cooperate, correct?

[RUPNICK:] Yes.

from the store and that he had taken Ambien and consumed alcohol prior to driving. Cesar was then formally arrested.

¶ 7.   Cesar also testified at the suppression hearing. According to Cesar, the officers knocked on the door for a "very long period of time" and knocked on the window repeatedly. They were speaking very loudly and telling him that he needed to come to the window and that they needed to talk to him. Cesar testified that the officers were using flashlights to illuminate the interior of his home. Cesar opened the window to inform the officers that he was not going to speak with them, to which they responded that they were going to get a warrant. According to Cesar, the officers knocked for approximately ten to fifteen minutes before he approached the window to tell them he did not want to speak with them. Cesar was in his bedroom when he first heard the knocking, but then proceeded to the kitchen to see what was happening. The officers were knocking, shouting, and shining flashlights before he came to the window. Cesar testified that he finally went to the door because "[the officers] told me they would not leave and they would stay there and get a warrant and take me into custody when they had the warrant."

¶ 8.   Following the hearing on April 24, 2009, the trial court denied Cesar's motion. In an oral ruling, the court found as follows:

> [Bastil], together with Officer John Rupnick, approached the front door of the residence while officer John Zabel watched the back door of the residence . . . .
>
> Officer Bastil indicated he knocked on the door initially getting. no response, further observed that there was a window next to the door, and by looking through the window observed that there was someone in the residence near the kitchen sink.

According to Officer Bastil he continues to knock, trying to get the attention of the person he observed. Eventually he observed that person stare at the officers at the front door but made no further movements or attempts at communication.

Officer Bastil continued to knock. Eventually that person came to the window, opening it to speak with the officers. The individual told Officer Bastil that he was Brian Cesar and wanted to know what the officers wanted. Officer Bastil indicated he responded, that he wanted to speak to him outside regarding the accident that just happened at Sibley and Calumet, and according to Officer Bastil also observed the odor of an intoxicant coming from Mr. Cesar's breath.

According to the officer, Mr. Cesar declined to come outside. The officer subsequently informed Mr. Cesar that if he—that he still wanted to speak to him, and if he did not come outside he would have to get a warrant to facilitate the contact.

Mr. Cesar continued to engage in conversation with the officers about whether or not he would step outside. Ultimately after several minutes of conversation, Mr. Cesar did exit the residence and talked with the officers.

With respect to Cesar's contention that the officers' actions constituted a seizure, the court determined:

The court recognizes that the initial reports of the incident in question came to the police agency at approximately 10:00 p.m. on the night in question; that the officers arrived at the Cesar residence roughly shortly thereafter.

It was apparent . . . that Mr. Cesar had arrived at that residence within a relatively short period of time prior to the officers' arrival. He had not been sleeping. As indicated it was approximately 10:00. There's no indi-

cation that Mr. Cesar had any difficulty understanding or comprehending the officers' instructions or directions, and that the officers did remain outside the residence at all times, according to the information provided. There was no request by the officers to enter the residence but merely asked Mr. Cesar to exit the residence in order that they may conduct further investigation.

While it is undisputed that Officer Bastil did advise Mr. Cesar that if he did not exit the residence, the officers would be seeking a warrant in order to enter the residence and make contact with him.

The Court does not find, in light of these facts and circumstances, that the officers remaining outside of the residence and requesting Mr. Cesar's cooperation in exiting the residence . . . constituted a seizure, such that has been prohibited under the constitution and subsequent case law.

I'm satisfied that the decision by Mr. Cesar to exit the residence was freely and voluntarily given . . . in light of a reasoned decision on his part, to communicate with the officers and provide the information as to the relevant facts and circumstances.

Following the denial of Cesar's motion to suppress, the matter proceeded to a bench trial on December 3, 2009. Cesar was found guilty of both offenses. He now appeals the trial court's denial of his motion to suppress evidence.

## DISCUSSION

¶ 9.   Cesar raises two challenges to the trial court's denial of his motion to suppress. Cesar first argues that he was unlawfully seized within his home in violation of his Fourth Amendment rights and, second, that his

statements to the police were involuntary. The City maintains that the officers did not "constructively seize" Cesar within his home and that the majority of the "knock and talk" interview[5] (and subsequent detention) occurred after Cesar voluntarily exited his home and stepped onto the porch. Both parties agree that there are no Wisconsin cases directly addressing this issue.

■

¶ 10.   In reviewing the denial of a suppression motion, this court upholds the trial court's findings of fact unless they are clearly erroneous. WIS. STAT. § 805.17(2). However, the application of constitutional principles to the facts as found is a question of law this court decides independently. Where, as here, the material facts are essentially undisputed, we apply the trial court's factual findings to the constitutional principles underlying claims of unlawful search and seizure in violation of the United States Constitution's Fourth Amendment and article I, section 11 of the Wisconsin Constitution. *See State v. Gaulrapp*, 207 Wis. 2d 600, 605 n.2, 558 N.W.2d 696 (Ct. App. 1996) (Wisconsin Supreme Court follows United States Supreme Court's interpretation of Fourth Amendment's search and seizure provision).

---

[5] A knock and talk "is a powerful investigative technique" where "police go to people's residences, with or without probable cause, and knock on the door to obtain plain views of the interior of the house, to question the residents, to seek consent to search, and/or to arrest without a warrant, often based on what they discover during the 'knock and talk.'" *State v. Phillips*, 2009 WI App 179, ¶ 11 n.6, 322 Wis. 2d 576, 778 N.W.2d 157 (citing Craig M. Bradley, *"Knock and Talk" and the Fourth Amendment*, 84 IND. L.J. 1099, 1099 (2009)), *review denied* (WI Jan. 14, 2010) (No. 2009AP249–CR).

■

¶ 11.   The Fourth Amendment to the United States Constitution and article I, section 11 of the Wisconsin Constitution protect "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *State v. Robinson*, 2010 WI 80, ¶ 24, 327 Wis. 2d 302, 786 N.W.2d 463 (citing U.S. CONST. amend. IV; WIS. CONST. art. 1, § 11). Therefore, any analysis regarding whether the Fourth Amendment protections have been breached must begin with whether a search and seizure occurred. *See United States v. Mowatt*, 513 F.3d 395, 399–400 (4th Cir. 2008).

■■

¶ 12.   As our supreme court has observed, not all police-citizen contacts constitute a seizure and, therefore, many such contacts do not fall within the safeguards afforded by the Fourth Amendment. *State v. Young*, 2006 WI 98, ¶ 18, 294 Wis. 2d 1, 717 N.W.2d 729. The United States Supreme Court's pronouncements on the Fourth Amendment implications of various types of encounters have been distilled by the Seventh Circuit Court of Appeals into the following three categories:

> The first category is an arrest, for which the Fourth Amendment requires that police have probable cause to believe a person has committed or is committing a crime. The second category is an investigatory stop, which is limited to a brief, non-intrusive detention. This is also a Fourth Amendment "seizure," but the officer need only have specific and articulable facts sufficient to give rise to a reasonable suspicion that a person has committed or is committing a crime. The third category involves no restraint on the citizen's liberty, and is characterized by an officer seeking the

771

citizen's voluntary cooperation through non-coercive questioning. This is not a seizure within the meaning of the Fourth Amendment.

*United States v. Odum*, 72 F.3d 1279, 1283 (7th Cir. 1995) (citation omitted). "As long as a reasonable person would have believed he [or she] was free to disregard the police presence and go about his [or her] business, there is no seizure and the Fourth Amendment does not apply." *Young*, 294 Wis. 2d 1, ¶ 18.

¶ 13.   Here, Cesar argues that because of the police conduct, he was not free to leave his home. He argues that, as a result, he was "unlawfully seized within his home." "It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980). A person is considered "seized" if a reasonable person would not feel free to leave or terminate the conversation with an officer, taking into account all of the circumstances surrounding the incident. *See United States v. Mendenhall*, 446 U.S. 544, 554 (1980). However, where as here, the situation is such that a person would not wish to leave his location, such as his home, the appropriate inquiry is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter. *See Florida v. Bostick*, 501 U.S. 429, 436 (1991). Thus, a "knock and talk" interview at a private residence that has lost its consensual nature and has effectively become an in-home seizure or "constructive entry" may trigger Fourth Amendment scrutiny under *Bostick*. *See id.* at 434; *see also United States v. Thomas*, 430 F.3d 274, 277 (6th Cir. 2005) (a "constructive entry" occurs when the police do not enter the house but "deploy overbearing

tactics that essentially force the individual out of the home"). Although the "constructive entry" doctrine has not been expressly adopted by Wisconsin courts, it provides a Fourth Amendment check on "knock and talk" encounters and we employ it here as the backdrop to our analysis.

¶ 14. It is undisputed that the officers did not enter Cesar's home, and Cesar concedes that there is no Wisconsin case law recognizing an in-home seizure when there is no entry to the home by police. Cesar therefore relies on two federal court cases, *United States v. Jerez*, 108 F.3d 684 (7th Cir. 1997) and *United States v. Reeves*, 524 F.3d 1161 (10th Cir. 2008), in support of his contention that he was constructively seized within his home even though the police did not physically enter it. We have reviewed both cases and conclude that Cesar's reliance is misplaced.

¶ 15. We begin with *Reeves*. There, the officers arrested the defendant at 3:30 a.m. just after he stepped out of his motel room. *Reeves*, 524 F.3d at 1164 & n.1. The *Reeves* court took note of both the time of the encounter, around 2:30 a.m., and the officers' actions, which included three officers "pound[ing] on Reeves' door and window while yelling and loudly identifying themselves as police officers." *Id.* at 1168–69. The officers continued this conduct "consistently for at least twenty minutes" before the defendant finally opened his door. *Id.* at 1169. The court noted the circumstances, including several police officers knocking and yelling at the door for twenty minutes in the early morning hours, before concluding that a reasonable person would not have felt free to ignore the officers' implicit command to open the door. *Id.* The court held that because the defendant answered his door in re-

773

sponse to a show of authority he was unlawfully seized. *Id.* at 1167–68, 1171. The court reasoned that, "if an individual's decision to open the door to his home to the police is not made voluntarily, the individual is seized inside his home." *Id.* at 1168.

¶ 16.  In *Jerez*, two police officers knocked intermittently for several minutes on the two defendants' motel room door at approximately 11:00 p.m. *Jerez*, 108 F.3d at 687. The officers received no response, and one of the officers spoke in the direction of the door, "Police. Open up the door. We'd like to talk to you." *Id.* Convinced they were being ignored, one of the officers went outside and knocked on the window of the motel room and was able to see one of the defendants when he shined a flashlight into the room. *Id.* The officer then said, through the window, "Sheriff's Department. Can we talk to you? Would you open up the door?" *Id.* One of the defendants nodded "yes," and opened the door. *Id.* On appeal, the court considered whether the defendants were "seized" within the meaning of the Fourth Amendment because a reasonable person would not have felt free to decline the officers' requests to open the door or otherwise ignore the officers' presence. *Id.* at 690. The Seventh Circuit concluded, based on the "totality of the unique circumstances" in that case, that a Fourth Amendment seizure occurred. *Id.* The court considered the "special vulnerability of those awakened in the night by a police intrusion at their dwelling place" and the conduct of the officers, including issuing the command, "Police. Open up the door." *Id.* at 690–91. Further, the Seventh Circuit reasoned that when analyzed under a reasonableness inquiry, a reasonable person would not have felt able to terminate the encounter with the police. *Id.* at 692–93.

774

¶ 17. In *Reeves* and *Jerez*, the courts considered the following nonexhaustive list of relevant factors in determining whether a "constructive entry" to a residence has occurred during a "knock and talk": the time of day, the number of officers present, the show of authority and officer persistence. And, while there are certain facts in this case that are akin to those in *Reeves* and *Jerez*, there are important factual distinctions. First, the officers approached Cesar's home shortly after he returned home from the store; unlike in *Jerez*, there is no suggestion in the record that Cesar was awakened by the police conduct, and unlike in *Reeves*, the encounter did not take place in the early morning hours. Second, although there were three officers at the residence, one was stationed at the back of the home leaving only two officers actively attempting to make contact with Cesar. Third, unlike the facts in *Jerez* or *Reeves*, the record in this case is void of any commands, express or implicit, made by the officers. Rather, while the officers knocked persistently at the outset, upon establishing contact with Cesar, they informed Cesar of his options and requested his cooperation.

¶ 18. The record reflects that after the officers' attempts to gain Cesar's attention, Cesar finally approached the window and conversed with them. While Cesar points to his initial indication that he did not wish to speak with the officers, there is no indication that he left the window. Instead, Cesar then engaged in a "back and forth" in which the officers attempted to persuade him to cooperate. During this exchange at the window, the officers did not make any threats toward Cesar to force him to exit his residence, they did not threaten to enter his residence, and they did not request entry into his residence. The officers simply requested Cesar to speak with them, and informed

775

Cesar that if he chose not to speak with them, they would obtain a warrant.[6] Implicit in this information is that Cesar could, in fact, ignore their requests that he cooperate and choose not to speak with them. The record reflects that Cesar, however, chose to engage in conversation and eventually exit the residence.

¶ 19.   In sum, we conclude, as did the trial court, that the police were not overly intrusive or coercive in attempting to gain contact with Cesar. We conclude that once informed of his or her options, a reasonable person would have understood that he or she was free to terminate the encounter. *See Bostick*, 501 U.S. at 436. We therefore reject Cesar's contention that he was unlawfully seized within his home.

¶ 20.   *Voluntary Statements Made to Police.* Once Cesar voluntarily exited his home, he responded to the officers' questioning by acknowledging that he had been driving and that he had taken Ambien and consumed alcohol. He was then arrested and cited for OWI, first offense. Cesar now wishes to challenge his statements as involuntary. A defendant's statements are voluntary so long as they are the product of free and uncon-strained will. *See State v. Clappes*, 136 Wis. 2d 222, 236, 401 N.W.2d 759 (1987). In assessing whether a

[6] Cesar does not contend that the officers would not have been able to obtain a warrant if it became necessary. *See State v. Kiekhefer*, 212 Wis. 2d 460, 473, 569 N.W.2d 316 (Ct. App. 1997) ("Police may not threaten to obtain a search warrant when there are no grounds for a valid warrant, but 'when the expressed intention to obtain a warrant is genuine . . . and not merely a pretext to induce submission, it does not vitiate consent.' " (Citation omitted.)).

defendant's statements were voluntary a court must look at the "totality of the circumstances." *Id.*

¶ 21. Here, Cesar acknowledges in his appellate brief that "[t]here was nothing particularly egregious or offensive about the manner of the interrogations," and that it was "friendly and consensual." However, Cesar contends that, under the totality of the circumstances, the statements were not voluntary, but resulted from a "nighttime intrusion into his home." As discussed above, the officers' actions in this case did not rise to the level of an intrusion into Cesar's home or a "constructive entry." Neither the trial court's findings nor the sworn testimony of the officers or Cesar indicate that any coercion or trickery followed Cesar's voluntary exit from his residence. Because the challenged statements followed this voluntary exit and Cesar was not otherwise coerced, there is no basis upon which to conclude that his statements were anything but voluntary.

## CONCLUSION

¶ 22. We conclude that Cesar was not unlawfully seized within his home when the officers attempted to make contact with him. We further conclude that Cesar's statements upon voluntarily exiting his residence were not involuntary. We therefore uphold the trial court's denial of Cesar's motion to suppress evidence and affirm the judgment.

*By the Court.*—Judgment affirmed.