¶ 46.
DANIEL KELLY, J.
(concurring). I write separately because I do not think there is probable cause to believe Mr. Weber committed jailable offenses before entering his garage, a conclusion that precludes deployment of the "hot pursuit" doctrine. I join the lead opinion's result, however, because there is a separate, and constitutionally-sufficient, basis for it.
f 47. Our task in this case is determining whether Deputy Dorshorst had the authority to pursue Richard L. Weber into his garage, and subsequently arrest and search him, without a warrant. Mr. Weber says the Wisconsin and United States Constitutions protected him from the deputy's warrantless intrusion (and, consequently, the search and arrest). The State, on the other hand, says Deputy Dorshorst was in hot pursuit of an individual who had committed two jailable offenses, and so was relieved of the obligation of obtaining a warrant before entering the garage and executing the arrest and search. I will address each of those asserted offenses separately, and then consider an alternative basis for Deputy Dorshorst's constitutionally-permissible entry into Mr. Weber's garage.
*235 I
¶ 48. There is no evidence that, before Mr. Weber entered his garage, Deputy Dorshorst thought he was in hot pursuit of someone who had committed a jailable offense.[1] Instead, the evidence demonstrates only that he was intent on performing a traffic stop. That's what he told dispatch when he followed Mr. Weber into his driveway. That's also what he told Mr. Weber after he apprehended him. And there is no indication a different or additional rationale made its way into the report Deputy Dorshorst ultimately prepared.[2] Nor was there any admissible evidence at the suppression hearing to suggest a different reason for entering Mr. Weber's garage.
¶ 49. But we don't require that a law enforcement officer have in mind, at the time he enters someone's home, a constitutionally-permissible reason for doing so. All we require is that the objective circumstances at the time could bring to mind a constitutionally-permissible basis for entry.[3] Although this standard invites post-hoc rationalizing of a law enforcement officer's intrusion into Fourth Amendment-protected spaces, we could hardly operate without such retro *236 spective analyses. It would be patently unreasonable to task a law enforcement officer with the responsibility of being consciously aware, minute by minute, of every possible constitutional basis for the next step he takes in the discharge of his duties. We expect him to follow the training he receives in constitutional requirements, but when he executes a traffic stop it is also reasonable to expect he will concentrate entirely on the functional task at hand, while simultaneously minimizing risks to the person of interest, the immediately surrounding community, and himself.
¶ 50. So, the State properly invites us to go to the record and consider the facts of this case like a slow-motion review of a football play. Having received such an invitation, we would be remiss if our analysis was less than precise, or we allowed factual nuances to escape our attention.
A
f 51. The constitutional dimension of Deputy Dorshorst's interaction with Mr. Weber centers on the garage's threshold: The legitimacy of what occurred beyond it depends on what occurred before it. Therefore, I will first address the facts as they transpired up to the point that Mr. Weber's car crossed the garage's threshold, and determine whether they describe probable cause to believe he committed a jailable offense.
¶ 52. On April 20, 2012, Deputy Dorshorst was driving behind Mr. Weber as they were both traveling northbound on County Highway E in the town of Arpin. Deputy Dorshorst noticed that Mr. Weber's high-mounted brake light was not functioning properly, and so decided to initiate a traffic stop. Deputy Dorshorst testified that "I activated my emergency *237 lights and he was turning into his driveway" off of County Highway E. The district attorney asked Deputy Dorshorst to clarify where he was in relation to Mr. Weber when he activated his emergency lights. His response was that "he was probably when I activated my emergency lights maybe 100 feet prior to his driveway." Mr. Weber "continued down his driveway and into his garage." Deputy Dorshorst followed Mr. Weber into his driveway, and stopped outside the garage approximately fifteen to twenty feet behind Mr. Weber's car (which at that point was parked inside the garage). During this period of time, Deputy Dorshorst was contacting dispatch to notify the station he was initiating a traffic stop. Neither Deputy Dorshorst nor Mr. Weber had, at that point, exited their cars.
¶ 53. This is the extent of the facts, up to the point Mr. Weber parked his car in his garage, of which we have been apprised. The State finds in these few, bare facts probable cause to believe Mr. Weber violated Wis. Stat. § 346.04(2t) (2011—12).[4] Because violation of that statute carries a potential jail sentence, the State asserts the "hot pursuit" doctrine to justify Deputy Dorshorst's decision to enter Mr. Weber's garage without a warrant.
f 54. If the State is right, if there really is probable cause to believe this offense occurred, then it is also right that the "hot pursuit" doctrine allowed *238 Deputy Dorshorst to enter the garage and conduct the search and arrest of Mr. Weber. State v. Ferguson, 2009 WI 50, ¶¶ 26-30, 317 Wis. 2d 586, 767 N.W.2d 187 (holding that hot pursuit may exist where an individual has committed a "jailable offense"). But this record discloses no probable cause to believe Mr. Weber violated Wis. Stat. § 346.04(2t).
¶ 55. The lead opinion correctly notes that "probable cause" is not a terribly high standard. All one needs is evidence "sufficient to warrant a reasonable person to conclude that the defendant.. . committed or [was] in the process of committing an offense." State v. Blatterman, 2015 WI 46, ¶ 35, 362 Wis. 2d 138, 864 N.W.2d 26 (quoting State v. Richardson, 156 Wis. 2d 128, 148, 456 N.W.2d 830 (1990)). Here, that quantum of evidence must show that Mr. Weber:
1. Operated a vehicle;
2. Received a visible signal to stop his vehicle from a traffic officer or marked police vehicle;
3. Failed to stop his vehicle as promptly as safety reasonably permitted; and
4. Knowingly resisted the traffic officer by failing to stop his vehicle as required.
Wis. Stat. § 346.04(2t).
¶ 56. Mr. Weber does not contest the sufficiency of evidence to meet elements one through three, and the record confirms their satisfaction. Deputy Dor-shorst observed Mr. Weber driving his car on a public highway, and followed him until he parked his car in the garage. There, Deputy Dorshorst observed Mr. Weber exit the vehicle. Thus, we know Mr. Weber was operating the vehicle. As to element two, Deputy *239 Dorshorst testified, without contradiction, that he activated his emergency lights while behind Mr. Weber on County Highway E, and that they were still on when both vehicles came to rest. The third element is a closer call, but the evidence appears sufficient to support it. Although it is difficult to know whether Mr. Weber could have safely and reasonably stopped his vehicle 100 feet after Deputy Dorshorst activated his emergency lights, we do know he was able to slow enough to enter his driveway within that space. And if that is true, then it must also be true that he could have stopped in the driveway. That is, it was not reasonably necessary for him to drive into his garage.
¶ 57. But that still leaves the fourth element. There is no probable cause to believe Mr. Weber violated this statute unless there is evidence that the failure to stop his vehicle on either the county highway or his driveway would lead "a reasonable person to conclude" Mr. Weber was knowingly resisting Deputy Dorshorst. On this, the record is silent.
¶ 58. It is certainly true that we do not need to wait until Mr. Weber announces he is intentionally resisting Deputy Dorshorst before we find this element satisfied. We may infer the intent to resist from conduct. State v. Stewart, 143 Wis. 2d 28, 35, 420 N.W.2d 44 (1988). However, his conduct in relation to this element is unremarkable. So completely unremarkable, in fact, that it compels me to depart from the lead opinion.
¶ 59. Maybe Mr. Weber could have stopped his car while still on County Highway E. He certainly could have stopped on the driveway. But was he knowingly resisting Deputy Dorshorst by parking in the garage instead of the driveway? Of course not. Deputy Dorshorst knew how far Mr. Weber could *240 possibly go with his car—the garage. And after reviewing the record, so do we . . . unless we are to assume Mr. Weber was not planning to stop at the back wall. There is nothing, however, to suggest this. So we all know there was a sure and certain end to Mr. Weber's travels on the 20th of April, and whether it was the driveway or the garage, the difference is a matter of feet. Because Deputy Dorshorst knew the stopping point of Mr. Weber's car would be almost immediately in front of him, this gives us nothing at all from which he (or we) may conclude an intent to resist. Probable cause may not be a rigorous standard, but it still requires some plausible evidence. These facts are simply incapable of indicating the presence of the fourth element.
¶ 60. This is no small quibble. If these unremarkable facts satisfy the State's admittedly light burden, it is difficult to imagine a traffic stop that would not provide probable cause to believe a jailable offense has occurred. Traffic stops normally take place on public highways, which means there is no sure and certain place that a law enforcement officer knows the person will stop. The highway environment is much less controlled than here, the variables much greater. Traffic, weather, road conditions, road construction activity, lighting, all will play into when and where the motorist might decide he can stop as "promptly as safety reasonably permit[s]." And that is before we even consider how quickly the motorist might recognize he is being signaled to stop. This means the distance a law enforcement officer might follow a driver before he pulls over can vary significantly. In the normal course of events, the officer assuredly cannot accurately predict, within a matter of feet, where the vehicle will come to rest (as he could here). So, unless *241 an observant driver immediately slams on his brakes and comes to a screeching halt when he sees a patrol car's emergency lights, an officer who wants to search the car or arrest the driver will always be able to plausibly say the motorist could have stopped a few feet earlier.
f 61. On that last point, we would do well to keep in mind that the State is asserting there was "probable cause," not just "reasonable suspicion" to believe Mr. Weber violated this statute. That has consequences. Probable cause regarding a jailable offense doesn't just give law enforcement officers a basis for asserting "hot pursuit." It also authorizes them to arrest motorists and conduct warrantless searches of their persons and vehicles. Maryland v. Dyson, 527 U.S. 465 (1999) (per curiam) (stating that probable cause is sufficient for warrantless search under the "automobile exception" to the Fourth Amendment); State v. Paszek, 50 Wis. 2d 619, 624-25, 184 N.W.2d 836 (1971) (holding probable cause sufficient for arrest). Under the State's reading, this statute is so powerful it can transmogrify the most minor imaginable equipment malfunction—a burnt-out light—into permission for a warrantless arrest and search. In finding probable cause here, we are telling Wisconsin's motorists that their protection from war-rantless searches and arrests incident to traffic stops is not our constitution, but instead law enforcement officers' discretion. It cannot be that easy to elide constitutional safeguards. Not only does this record not support probable cause with respect to this statute, it must not.
¶ 62. The facts the State offers us reveal no probable cause to believe Mr. Weber violated Wis. Stat. § 346.04(2t). As a result, the State may not use the "hot pursuit" doctrine to justify Deputy Dorshorst's deci *242 sion to enter Mr. Weber's garage without a warrant— at least with respect to this statute.
B
¶ 63. There is still, of course, the State's argument that Mr. Weber committed a second jailable offense capable of supporting its "hot pursuit" theory. If we include Mr. Weber's actions after entering his garage, the State says there was probable cause to believe Mr. Weber was resisting a law enforcement officer in violation of Wis. Stat. § 946.41(1) (another jailable offense). So now we extend the temporal horizon to reach those facts in determining whether they excuse the need for a warrant.
¶ 64. When the replay of events paused to conduct the analysis above, Mr. Weber was in his car in his garage. Deputy Dorshorst was in his patrol car on the driveway, just outside the garage with his emergency lights activated. And the only constitutionally-relevant facts ascertainable at that point were that one of Mr. Weber's brake lights was out, and he had driven into the garage instead of stopping on the driveway. As already discussed, these facts support a traffic stop, but nothing more. The replay now picks up from there, and we learn the following.
¶ 65. Mr. Weber and Deputy Dorshorst exited their vehicles at about the same time. Mr. Weber started moving towards the door from the attached garage into his house. Simultaneously, Deputy Dor-shorst moved towards the front of his patrol car in an effort to keep Mr. Weber in view. When Mr. Weber started walking up the stairs to the house door, Deputy Dorshorst told Mr. Weber he "needed to speak with him." When Mr. Weber did not stop, Deputy Dorshorst *243 entered the garage and again told him he "needed to speak with him." Because this is the point at which Deputy Dorshorst passed into Fourth Amendment-protected space,[5] the replay must pause again so we can determine whether the objectively ascertainable facts at that point plausibly suggest a violation of Wis. Stat. § 946.4K1).[6]
¶ 66. If the "hot pursuit" exception to the warrant requirement is to get Deputy Dorshorst inside the garage without a constitutional violation, there must be probable cause to believe Mr. Weber committed a jailable offense before he entered the garage. "We thus conclude that a suspect may not defeat an arrest which has been set in motion in a public place, and is therefore proper under Watson,[7] by the expedient of escaping to a private place." United States v. Santana, 427 U.S. 38, 43 (1976); see also State v. Smith, 131 Wis. 2d 220, 232, 388 N.W.2d 601 (1986) (quoting Welsh v. Wisconsin, 466 U.S. 740, 753 (1984)) (stating that hot pursuit occurs "where there is an 'immediate or continuous pursuit of [a suspect] from the scene of a *244 crime' "). This makes sense—the entire purpose behind this exception is to prevent an offender's retreat into Fourth Amendment-protected space from frustrating an arrest that started outside that space.
¶ 67. So the problem with the State's argument is that the jailable offense must have commenced before Mr. Weber reached his garage. As discussed above, the objectively ascertainable facts by that point only supported Deputy Dorshorst's pursuit of Mr. Weber for a bad brake light. Driving with a dysfunctional light is not a jailable offense. Thus, nothing happened before Mr. Weber entered his garage capable of supporting a "hot pursuit" argument.
¶ 68. Even if we could consider the facts transpiring after Mr. Weber entered the garage, there is nothing to support a reasonable belief that a jailable offense had occurred, or was in the process of happening. Before Deputy Dorshorst entered the garage, he said he told Mr. Weber that he "needed to speak with him." Mr. Weber, however, continued moving towards the door into his house. These additional facts, according to the State, are supposed to provide probable cause to believe Mr. Weber was knowingly resisting or obstructing an officer. To make such a showing, the State must demonstrate that Deputy Dorshorst was acting in an official capacity, that he exercised lawful authority, and that Mr. Weber knowingly resisted or obstructed what Deputy Dorshorst was lawfully trying to accomplish in his official capacity.
¶ 69. The State says the action with which Mr. Weber interfered was his refusal to stop when Deputy Dorshorst told him he "needed to speak with him." This depends, in part, on what was meant by the deputy's statement. "I need to speak with you," when considered in isolation, is of dubious import. It could *245 potentially be understood as a request to speak immediately, a command that Mr. Weber speak with him at some point, or a command that Mr. Weber speak with him immediately. But when a deputy sheriff makes this statement when his patrol car is just a few feet away with its emergency lights flashing, the only reasonable understanding is that one must immediately cease whatever one is doing and give him your undivided attention.
f 70. Deputy Dorshorst intended his statement to restrict Mr. Weber's freedom to move about in his home. That is, he intended his words to effect a seizure of Mr. Weber just as surely as if he were physically restraining him. And it is reasonable to understand those words as such. Mr. Weber's failure to understand it that way (or heed the command) led Deputy Dor-shorst to follow his words into the garage, and accomplish physically what his words could not.
f 71. Thus, the question is whether Deputy Dor-shorst had lawful authority to command Mr. Weber to stop what he was doing and submit to questioning. The State's argument simply assumes we should answer that question affirmatively, but it provided no adequate explanation. This is a significant shortcoming; if, by nothing more than his command, an officer has the lawful authority to freeze a person in place such that the failure to comply justifies warrantless entry of his home, then the Fourth Amendment is a false promise.[8] An officer could manufacture a basis for *246 crossing into protected space simply by commanding the occupant to come out. Failure to comply would justify an incursion to fetch him. This we do not tolerate. See generally City of Sheboygan v. Cesar, 2010 WI App 170, ¶ 18, 330 Wis. 2d 760, 796 N.W.2d 429 (noting that people inside their homes may "ignore [the officers'] requests that [they] cooperate and choose not to speak with them," though the officers could still seek a warrant).
¶ 72. The State's argument doesn't hit true because it does not explain why Deputy Dorshorst can lawfully command a man in his own home to do anything under these circumstances. Without that, there can be no violation of Wis. Stat. § 946.41(1). And in the absence of a violation, the State cannot argue Deputy Dorshorst was in hot pursuit when he entered Mr. Weber's garage (even if we were to consider Mr. Weber's conduct after he entered his garage, which we may not do). If this was the end of the analysis, I would have to conclude that Deputy Dorshorst unconstitutionally entered Mr. Weber's garage. But it is not the end.
II
¶ 73. The reason Deputy Dorshorst could enter Mr. Weber's garage without violating constitutional guarantees is that Mr. Weber consented to his entry. Warrantless searches and seizures are not "unreasonable" within the meaning of the Fourth Amendment when the suspect consents. State v. Artic, 2010 WI 83, ¶ 29, 327 Wis. 2d 392, 786 N.W.2d 430.
¶ 74. When we consider this exception to the warrant requirement, we first look for words, gestures, *247 or conduct that one can reasonably understand to manifest consent to the search. State v. Phillips, 218 Wis. 2d 180, 197, 577 N.W.2d 794 (1998). We then examine the facts to ensure the suspect gave consent voluntarily—that is, "in the absence of duress or coercion, either express or implied." Id.
¶ 75. Here, Mr. Weber gave Deputy Dorshorst consent to enter his garage for the purpose of completing the traffic stop that had commenced on a public highway. As discussed above, Deputy Dorshorst initiated the traffic stop while both he and Mr. Weber were on County Highway E. Mr. Weber then slowed and pulled into his driveway. He did not, however, stop there. He instead pulled into his garage.
¶ 76. Had Mr. Weber chosen to stop in his driveway, which he clearly could have done, this case would not be before us. Deputy Dorshorst would have approached the car, spoken with Mr. Weber, observed the indicia of intoxication, and the remaining events would likely have unfolded as they actually did. But with one exception—it all would have happened outside constitutionally-protected space, and the sanctity of Mr. Weber's home would have remained intact.
¶ 77. The reason the events at issue took place in Mr. Weber's garage is because that is where Mr. Weber chose for them to take place. He was, without question, obligated to stop so that Deputy Dorshorst could investigate the defective brake light. State v. Gaulrapp, 207 Wis. 2d 600, 605, 558 N.W.2d 696 (1996) ("A traffic stop is generally reasonable if the officers have probable cause to believe that a traffic violation has occurred, or have grounds to reasonably suspect a violation has been or will be committed." (citation omitted)); see also Terry v. Ohio, 392 U.S. 1, 22 (1968) ("[A] police officer may in appropriate circumstances and in an appropri *248 ate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest"). That obligation attached when Deputy Dorshorst activated his emergency lights, and it persisted thereafter until the lawful incidents to a traffic stop were complete.
f 78. So as Mr. Weber continued from his driveway into his garage, he was operating under a continuing obligation to allow Deputy Dorshorst to complete the traffic stop that had commenced on County Highway E. Entering the garage did not terminate the obligation—it followed him inside. And because we presume that Wisconsin's citizens know the law,[9] we can conclude that Mr. Weber knew he was under this obligation.
¶ 79. Knowing his obligation, Mr. Weber chose where he would stop, and in doing so also chose where Deputy Dorshorst would perform his duties. His conduct would communicate to a reasonable observer that he preferred to complete the traffic stop in his garage, rather than on the driveway. Having extended that invitation, Mr. Weber may not fault Deputy Dorshorst for accepting it.
¶ 80. The next step in the "consent" analysis is to determine whether Mr. Weber was under any duress or coercion (whether express or implied) to provide that consent. There are no facts of record to indicate he might have been. Indeed, quite the opposite is true. To the extent there was any duress or coercion in these facts, it was to prevent Mr. Weber from offering this *249 conduct-based invitation to Deputy Dorshorst. The patrol car's emergency lights were an unequivocal command to submit to a traffic stop. Mr. Weber could have complied by stopping in his driveway. To the extent the emergency lights exerted coercion or duress, they certainly weren't encouraging Mr. Weber to proceed into his garage. Thus, Mr. Weber's consent was voluntary.
¶ 81. Consequently, it was not constitutionally unreasonable for Deputy Dorshorst to enter Mr. Weber's garage for the purpose of performing the traffic stop that had commenced on a public highway. A law enforcement officer may, during a lawful traffic stop, detain everyone in the vehicle. Brendlin v. California, 551 U.S. 249, 255 (2007) ("The law is settled that in Fourth Amendment terms a traffic stop entails a seizure of the driver 'even though the purpose of the stop is limited and the resulting detention quite brief.'" (quoting Delaware v. Prouse, 440 U.S. 648, 653 (1979))). The scope and duration of the stop are limited by the purpose for effecting the stop: "Like a Terry stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop, and attend to related safety concerns." Rodriguez v. United States, 135 S. Ct. 1609, 1614 (2015) (citations omitted). Because of the invitation Mr. Weber extended, Deputy Dorshorst was authorized to do all of this in the garage.
¶ 82. It is at this point that I rejoin the lead opinion. My need to write separately stemmed only from the State's constitutionally-insufficient (in my view) basis for justifying Deputy Dorshorst's presence in the garage. Because he did, in fact, have that authority (by virtue of the conduct-based invitation), he also had the lawful authority to command Mr. *250 Weber to stop moving towards the house door so that he could complete the traffic stop. When Mr. Weber failed to comply, Deputy Dorshorst lawfully and appropriately restrained Mr. Weber's further progress. The discovery of incriminating evidence appropriately followed, as well as the conviction. For that reason, I join the lead opinion's conclusion that the court of appeals must be reversed.

 The lead opinion's explanation of the "hot pursuit" doctrine is well-stated, and needs no further treatment here.

 If Deputy Dorshorst had recorded such additional or different rationale in his report, I suspect it would have been offered at the suppression hearing to help him refresh his recollection of why he entered Mr. Weber's garage.

 "[Wjhen an officer's Fourth Amendment search and seizure conduct is supported by an objectively ascertainable basis for probable cause or reasonable suspicion, the police conduct meets the Fourth Amendment's requirement of reasonableness, thereby causing subjective motivations to be of little concern." State v. Kramer, 2009 WI 14, ¶ 27, 315 Wis. 2d 414, 759 N.W.2d 598.

 All subsequent references to the Wisconsin Statutes are to the 2011-12 version unless otherwise indicated.
This statute commands that "[n]o operator of a vehicle, after having received a visible or audible signal to stop his or her vehicle from a traffic officer, or marked police vehicle, shall knowingly resist the traffic officer by failing to stop his or her vehicle as promptly as safety reasonably permits." Wis. Stat. § 346.04(2t).

 Technically, we count an attached garage as part of the "curtilage" of Mr. Weber's home. The curtilage comprises "the land and buildings immediately surrounding a house." State v. Martwick, 2000 WI 5, ¶ 1 n.2, 231 Wis. 2d 801, 604 N.W.2d 552 (citing United States v. Dunn, 480 U.S. 294, 300 (1987)). For purposes of Fourth Amendment analysis, we treat the cur-tilage as identical to the house itself. State v. Dumstrey, 2016 WI 3, ¶ 23, 366 Wis. 2d 64, 873 N.W.2d 502.

 A person violates this statute when he "knowingly resists or obstructs an officer while such officer is doing any act in an official capacity and with lawful authority. .. ." Wis. Stat. § 946.41(1).

 United States v. Watson, 423 U.S. 411 (1976) (finding warrantless arrest of an individual in a public place upon probable cause does not violate the Fourth Amendment).

 Sutterfield v. City of Milwaukee, 751 F.3d 542, 550 (7th Cir. 2014) ("At the core of the privacy protected by the Fourth Amendment is the right to be let alone in one's home."); Kylio v. United States, 533 U.S. 27, 31 (2001) (" 'At the very core[1] of the Fourth Amendment 'stands the right of a man to retreat into his own home and there be free from unreasonable *246 governmental intrusion.'" (quoting Silverman v. United States, 365 U.S. 505, 511 (1961))).

 State v. Neumann, 2013 WI 58, ¶ 50 n.29, 348 Wis. 2d 455, 832 N.W.2d 560. This is the legal maxim of ignorantia juris neminem excusat, or "ignorance of the law excuses no one." Ignorantia Juris Non Excusat, Black's Law Dictionary, (10th ed. 2014).

 I use the term "lead" opinion for two reasons. First, I am concerned that without this cue, the reader may mistakenly believe that the lead opinion has any precedential value. Although four justices join in the mandate of the opinion to reverse the court of appeals (Zeigler, J., joined by Roggensack, C.J., Gableman, J. and Kelly, J.), it represents the reasoning of only three justices (Ziegler, J., joined by Roggensack, C.J., and Gableman, J.). Justice Kelly joined in the mandate, but would reverse on other grounds.
Although set forth in three separate opinions, four justices—a majority of the court—disagree with the reasoning of the lead opinion. Contrary to the lead opinion, four justices determine that there was neither probable cause nor exigent circumstances here (Abrahamson, J., Ann Walsh Bradley, J., Rebecca Grassl Bradley, J., and Kelly, J.).
Second, I use the term "lead" opinion because although it is undefined in our Internal Operating Procedures, its use here is consistent with past description. We have said "that a lead opinion is one that states (and agrees with) the mandate of a majority of the justices, but represents the reasoning of less than a majority of the participating justices." State v. Lynch, 2016 WI 66, ¶ 143, 371 Wis. 2d 1, 885 N.W.2d 89 (Abrahamson & Ann Walsh Bradley, J.J., concurring in part, dissenting in *251 part) (citing Hoffer Props., LLC v. State, Dep't of Transp., 2016 WI 5, 366 Wis. 2d 372, 874 N.W.2d 533).