## COURT OF APPEALS
## DECISION
## DATED AND FILED

## May 20, 2020

**Sheila T. Reiff**
**Clerk of Court of Appeals**

**NOTICE**

This opinion is subject to further editing.  If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals.  *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal Nos.** **2019AP1187**
**2019AP1188**

Cir. Ct. Nos.  **2018TR1683**
**2018TR1713**

**STATE OF WISCONSIN**

**IN COURT OF APPEALS**
**DISTRICT II**

NO. **2019AP1187**

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

DONALD SIMON MULLEN,

DEFENDANT-APPELLANT.

NO. **2019AP1188**

COUNTY OF WAUKESHA,

PLAINTIFF-RESPONDENT,

V.

DONALD SIMON MULLEN,

DEFENDANT-APPELLANT.

APPEALS from judgments of the circuit court for Waukesha County: MICHAEL P. MAXWELL, Judge. *Affirmed*.

¶1 NEUBAUER, C.J.[1] Donald Simon Mullen appeals from judgments convicting him for refusal to take a test for intoxication and for operating a motor vehicle while intoxicated (OWI) (first offense) and challenges the denial of his motion to suppress. He contends an officer seized him without reasonable suspicion. We reject his challenges and affirm.

## BACKGROUND

¶2 The following facts are from testimony at the hearing on the motion to suppress. At approximately 1:20 a.m. Deputy Nicholas Ollinger observed Mullen turn into the parking lot of a bar. The officer drove past the bar, made a U-turn, and drove past the bar a second time. He then made another U-turn and drove into the bar's parking lot. Ollinger advised dispatch that he would "be out with an individual."

¶3 Ollinger parked his marked squad car behind Mullen's vehicle, offset to the left. Ollinger's squad car was "a fair amount away" from Mullen's vehicle, such that Mullen could have backed up and left the parking lot "without any problem." A witness for Mullen, a private investigator, agreed that videos

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(c) (2017-18). All references to the Wisconsin Statutes are to the 2017-18 version.

from the bar also showed that Mullen could have pulled forward and turned around to leave the lot.

¶4    The bar was closed, and there were no other vehicles or people in sight.  Mullen was standing on the curb next to the front of the bar.  A light from the bar illuminated him, and the headlights from Ollinger's squad car illuminated Mullen's vehicle.

¶5    Ollinger activated his squad car's spotlight at Mullen.  Ollinger acknowledged that it is an "extremely high intensity spotlight" and serves a "disabling function" because it prevents the person from seeing the officer as he or she approaches.

¶6    Ollinger got out of his squad car and approached Mullen.  Ollinger wore his sheriff's uniform and had his firearm on his hip.  He told Mullen that he worked for the Waukesha County Sheriff's Department.

¶7    Ollinger testified he asked Mullen in a conversational tone where Mullen was coming from.  Mullen repeatedly informed Ollinger that he was not going to drive anymore, that he was being responsible, and that he was going to get an Uber ride home.  Mullen kept repeating himself, had slurred speech, and was swearing.  Ollinger noted a strong odor of intoxicants coming from Mullen.

¶8    Ollinger asked Mullen to perform field sobriety tests.  Mullen initially agreed, but when he began one of the tests, he "had a hard time maintaining his balance," and then refused all testing.  Ollinger arrested Mullen for OWI.

¶9     The State cited Mullen for refusal, and the County cited him for OWI and operating with a prohibited alcohol content (PAC).[2]  Mullen moved to suppress the evidence, arguing that Ollinger did not have reasonable suspicion to approach and effectively seize him to investigate.  The State responded that there was no seizure until Ollinger asked Mullen to perform field sobriety tests, at which point there was reasonable suspicion to detain him.  The court denied Mullen's motion to suppress, affirming its decision after a motion for reconsideration.  The court later found Mullen guilty for the refusal and for OWI after a trial to the court and dismissed the PAC citation pursuant to WIS. STAT. § 346.63(7)(b).  Mullen appeals.

## DISCUSSION

¶10     The question in this case is whether, when Ollinger pulled up behind Mullen's vehicle in his marked squad car in an empty parking lot, shined his spotlight on Mullen and approached Mullen, Mullen was seized for Fourth Amendment purposes.  Review of a decision as to whether someone has been seized is a mixed question of fact and law.  *County of Grant v. Vogt*, 2014 WI 76, ¶17, 356 Wis. 2d 343, 850 N.W.2d 253.  We uphold the circuit court's findings of fact unless they are clearly erroneous, but the application of constitutional principles to those facts is a question of law we review de novo.  *Id.*

¶11     The Fourth Amendment of the United States Constitution and article I, section 11 of the Wisconsin Constitution protect the right to be free from unreasonable searches and seizures.  *State v. Young*, 2006 WI 98, ¶18, 294

---

[2]  Because the same issue is involved, we consolidated these appeals for disposition on our own motion.  *See* WIS. STAT. RULE 809.10(3).

Wis. 2d 1, 717 N.W.2d 729. Wisconsin courts generally construe our state constitutional protections in the same way as the United States Supreme Court has interpreted the Fourth Amendment. *Id.*, ¶30.

¶12 The protections against unreasonable seizures have bearing only when a government agent "seizes" a person. *Id.*, ¶23. Not every encounter with police is a seizure under the Fourth Amendment. *Florida v. Bostick*, 501 U.S. 429, 434 (1991). Courts have recognized two types of seizures: an investigatory or *Terry*[3] stop and an arrest. *Vogt*, 356 Wis. 2d 343, ¶27. An investigatory stop typically entails only temporary questioning and is constitutional if police have a reasonable suspicion that a crime has been, is being or about to be committed. *Young*, 294 Wis. 2d 1, ¶20. An arrest is a more permanent seizure, often leading to a criminal prosecution, and is constitutional if police officers have probable cause to suspect that a crime has been committed. *Id.*, ¶22.

¶13 It is well settled that, absent a restraint on a person's liberty (a seizure), officers may seek a citizen's voluntary cooperation through noncoercive questioning. *City of Sheboygan v. Cesar*, 2010 WI 170, ¶12, 330 Wis. 2d 760, 796 N.W.2d 429; *Bostick*, 501 U.S. at 434 ("no reasonable suspicion is required" if "the encounter is consensual"). Thus, officers do not infringe on the right against unreasonable seizures simply by approaching persons on the street or in other public places and asking questions of them if they are agreeable to listen. *United States v. Drayton*, 536 U.S. 194, 200 (2002); *see also Vogt*, 356 Wis. 2d 343, ¶¶24-26. "While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly

---

[3] *Terry v. Ohio*, 392 U.S. 1, 30 (1968).

eliminates the consensual nature of the response." *Drayton*, 536 U.S. at 205 (citation omitted).

¶14 Our supreme court's recent decision in *Vogt* is instructive. The police officer saw Vogt turn and pull into an empty parking lot at about 1:00 a.m. on Christmas morning. *Vogt*, 356 Wis. 2d 343, ¶4. The officer did not observe any traffic violations, but given the time, day and location, he thought it was odd for someone to park there. *Id.*, ¶¶4-5. The officer parked his squad car behind Vogt; his headlights were on but his emergency lights were not. *Id.*, ¶6.

¶15 The officer, in full uniform and carrying a pistol in his holster, got out of his squad car, walked up to Vogt's window, and rapped on the window for Vogt to roll it down. *Id.*, ¶¶7, 43. When Vogt rolled down the window, the officer asked him what he was doing, and when Vogt responded, the officer observed that Vogt's speech was slurred and that the smell of intoxicants emanated from the vehicle. *Id.*, ¶8. Ultimately, Vogt was arrested for OWI. *Id.*, ¶9. The question on appeal was whether the officer's approach of rapping on the window of Vogt's car constituted a seizure under the Fourth Amendment for which the officer would have needed reasonable suspicion that Vogt had committed, was committing, or was about to commit a crime.

¶16 As the *Vogt* court explained, the state and federal constitutional protections against unreasonable seizures do not come into play until a government agent "seizes" a person. *Id.*, ¶19. A seizure occurs when the police officer has restrained the liberty of an individual "by means of physical force or show of authority." *Id.*, ¶20 (citation omitted). "[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed

6

that he was not free to leave." ***United States v. Mendenhall***, 446 U.S. 544, 554 (1980). Behaviors that might suggest a seizure include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." ***Id.*** Without similar evidence that the officer conducted himself, such that a reasonable person would not feel free to leave, there is no seizure as a matter of law. ***Vogt***, 356 Wis. 2d 343, ¶23. It is an objective test that "presupposes an *innocent* person." ***Bostick***, 501 U.S. at 438.

¶17 There was no seizure when the officer approached Vogt's car and rapped on the window for him to roll it down. ***Vogt***, 356 Wis. 2d 343, ¶41. The ***Vogt*** trial court found that the officer was not commanding Vogt but merely trying to make contact. ***Id.***, ¶43. Indeed, he was investigating an unusual situation.

> [The officer] was acting as a conscientious officer. He saw what he thought was suspicious behavior and decided to take a closer look. Even though Vogt's conduct may not have been sufficiently suspect to raise reasonable suspicion that a crime was afoot, it was reasonable for [the officer] to try to learn more about the situation by engaging Vogt in consensual conversation.

***Id.***, ¶51 (footnote omitted). "The circumstances attendant to the knock … [we]re not so intimidating as to transform the knock into a seizure." ***Id.***, ¶53.

¶18 Comparing ***Vogt*** to Mullen's case, we agree with the circuit court that, under the totality of the circumstances, Ollinger did not seize Mullen. As in ***Vogt***, the officer did not stop Mullen. *See* ***Vogt***, 356 Wis.2d 343, ¶41. Mullen was already out of his vehicle and the officer simply approached him. None of the ***Mendenhall*** examples of behavior demonstrating a seizure were present. *See* ***Vogt***, 356 Wis. 2d 343, ¶53. Only one officer was present in each case, no

displays of weapons were made, neither officer attempted to touch the suspect or issue forceful verbal commands, and the officers did not manage the person's movements or require the individual to stay on the scene. Similarly, both squad cars were parked partly behind the other vehicle, but still allowed room to leave. No emergency lights were activated.[4]

¶19 Mullen contends he was seized because it was late at night and there were no pedestrians around; the officer had a firearm and identified himself as a deputy sheriff; Mullen had exited his vehicle and it would be awkward to simply get in his vehicle and drive away; and the officer shined a high-intensity spotlight on him, unnecessarily because the bar's lights already illuminated Mullen.

¶20 Again similar to *Vogt*, it was late at night and Mullen was in an empty parking lot, and further the officer was investigating unusual circumstances—why someone entered an empty parking lot of a business that was clearly closed. In both cases, the officers were in marked squad cars, were in uniform, and had firearms. Marked squad cars, uniforms, and side arms are well known and common tools of the police professions, such that their presence, without more, does not establish that a reasonable person would not have believed he or she was not free to leave.

¶21 Mullen contends he was less likely to feel free to leave because he had exited his vehicle, unlike Vogt, who was still in his vehicle. We see little

---

[4] Mullen suggests that the consensual nature of the encounter with Ollinger is undermined by the fact that Ollinger followed him for a period of time without any reason, that is to say, without Mullen committing any traffic violations. Mullen points to no authority, legal or factual, to demonstrate how this is relevant to whether the consensual encounter amounted to a seizure, particularly given that there is no evidence that Mullen was aware that Ollinger had followed him, making two U-turns before entering the parking lot.

difference, as the issue is whether he was able to decline to engage with the officer. As the court in *Vogt* stated, "[I]f an officer merely walks up to a person standing or sitting in a public place ... and puts a question to him [or her], this alone does not constitute a seizure." *Vogt*, 356 Wis. 2d 343, ¶38 n.17 (citation omitted). The court recognized that the analysis is complicated because people tend to defer to a symbol of authority no matter how manifested, but concluded that "a person's consent is no less valid simply because an individual is particularly susceptible to social or ethical pressures." *Id.*, ¶31.

¶22    Thus, the issue is whether the combination of the spotlight and the approach served to detain Mullen. We think not. In *Young*, our supreme court considered whether a seizure occurred when a police officer pulled up in the middle of the street next to a vehicle parked behind Young's car, activated its emergency flashers, and pointed a spotlight at the car. *Young*, 294 Wis. 2d 1, ¶65. The court noted that "many courts have concluded that the use of a spotlight is not a show of authority sufficient to effect a seizure." *Id.*, ¶65 n.18 (citing *State v. Baker*, 107 P.3d 1214, 1216-18 (Idaho 2004) (no seizure when spotlight was used; citing cases with similar holdings)); *State v. Young*, 957 P.2d 681, 688-89 (Wash. 1998) (en banc) (under the totality of the circumstances, the court found no seizure when spotlight illuminated the defendant). Indeed, the court noted that "spotlights are likely to be used at night." *Young*, 294 Wis. 2d 1, ¶65 n.18. While the court did not reach the issue of seizure at that point in time, the court opined "we are reluctant to conclude that the positioning of the officer's car, together with the lighting he employed, necessarily involved such a show of authority that 'a reasonable person would have believed that he was not free to leave.'" *Id.*, ¶69 (citation omitted).

¶23     Here, the circuit court expressed concern that a rule that an officer's use of a spotlight creates a per se detention would discourage officers from using such lights when necessary for their safety or the safety of others. The ***Baker*** court, cited favorably in ***Young***, agreed. *See **Baker***, 107 P.3d at 1218. Here, the officer testified that he was trained to use the light for officer safety, and the circuit court found the use was reasonable.

¶24     Lastly, since ***Young*** and ***Baker***, a number of courts have adopted the same reasoning, finding that the use of a spotlight, absent other coercive circumstances, does not amount to a seizure. For example, although unpublished but available for its persuasive value,[5] in ***State v. Macho***, No. 2011AP1841-CR, unpublished slip op. ¶2 (WI App May 23, 2012), the police officer pulled up behind the defendant's vehicle and shined his spotlight on the vehicle. Relying on ***Young***, we found that the officer's actions did not amount to a seizure of the defendant. ***Macho***, No. 2011AP1841-CR, ¶8. *See also **United States v. Lawhorn***, 735 F.3d 817, 820 (8th Cir. 2013) ("The act of shining a spotlight on a person's car typically does not constitute a seizure"); ***United States v. Mabery***, 686 F.3d 591, 597 (8th Cir. 2012) ("[T]he act of shining a spotlight on [the] vehicle from the street was certainly no more intrusive (and arguably less so) than knocking on the vehicle's window."); ***United States v. Clements***, 522 F.3d 790, 792, 795 (7th Cir. 2008) (no seizure where squad car parked fifteen to twenty feet behind defendant's vehicle, and officers "shined a spotlight on the [vehicle] and activated their flashing red and blue lights" before approaching; the officers were merely "illuminating their flashing lights for identification and safety purposes");

---

[5] *See* WIS. STAT. RULE 809.23(3)(b) (a one-judge opinion may be cited for persuasive authority if issued on or after July 1, 2009).

10

*Campbell v. State*, 841 N.E.2d 624, 628, 630 (Ind. Ct. App. 2006) (by itself, shining of spotlight does not reflect a show of authority to make a reasonable person believe that he or she is not free to leave); *Commonwealth v. Briand*, 879 N.E.2d 1270, 1272 (Mass. Ct. App. 2008) (an officer illuminating the area before approaching the vehicle does not constitute a seizure; otherwise, officers would be discouraged from using their lights when necessary for their safety or the safety of others).[6]

¶25    In sum, the use of the spotlight, where there was no effort to block Mullen's vehicle, no activation of emergency lights, and no verbal commands, does not amount to a seizure.  There was no seizure until Ollinger asked Mullen to perform field sobriety tests, at which point there is no question that Ollinger had reasonable suspicion.[7]

---

[6] Mullen cites to several cases that purportedly support his argument that the shining of a high-intensity spotlight effectively constitutes a seizure.  These cases are not compelling, as each involved other coercive circumstances that, added to the spotlight, amounted to a seizure.  *See People v. Garry*, 67 Cal. Rptr. 3d 849, 851-52 (Cal. Ct. App. 2007) (officer also all but ran at defendant while asking about his legal status in such a manner that a reasonable person would feel compelled to respond); *State v. Jestice*, 861 A.2d 1060, 1062 (Vt. 2004) (officer used squad car to block, nose-to-nose, the defendant's car); *State v. Garcia-Cantu*, 253 S.W.3d 236, 245-49 & n.43 (Tex. Crim. App. 2008) (finding a seizure under the circumstances [using spotlight, parking close to box in defendant's car, using a commanding, authoritative voice and demeanor that brooked no disagreement, waving flashlight into defendant's eyes while questioning], but noting the distinction that "[t]he use of 'blue flashers' or police emergency lights are frequently held sufficient to constitute a detention or seizure," whereas "[t]he use of a [patrol car] spotlight, by itself," does not necessarily convert a consensual encounter into a seizure).

[7] Mullen's challenge is limited to whether the consensual encounter became a seizure, and he does not develop any argument challenging reasonable suspicion after Ollinger spoke with him and noticed his slurred speech, his repeated statements that he did not intend to drive anymore, and the odor of intoxicants on this breath.

*By the Court.*—Judgments affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.