# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2020AP1014-CR |

| | |
|---|---|
| COMPLETE TITLE: | State of Wisconsin, |
| | Plaintiff-Respondent, |
| | v. |
| | Christopher D. Wilson, |
| | Defendant-Appellant-Petitioner. |

REVIEW OF DECISION OF THE COURT OF APPEALS
Reported at 398 Wis. 2d 632, 962 N.W.2d 273
(2021 – unpublished)

| | |
|---|---|
| OPINION FILED: | November 23, 2022 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | September 12, 2022 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Milwaukee |
| JUDGE: | David L. Borowski |

JUSTICES:
ANN WALSH BRADLEY, J., delivered the majority opinion for a unanimous Court.
NOT PARTICIPATING:

ATTORNEYS:

For the defendant-appellant-petitioner, there were briefs filed by *David Malkus*, assistant state public defender. There was an oral argument by *David Malkus,* assistant state public defender.

For the plaintiff-respondent, there was a brief filed by *Anne C. Murphy,* assistant attorney general, with whom on the brief was *Joshua L. Kaul,* attorney general. There was an oral argument by *Anne C. Murphy,* assistant attorney general.

No. 2020AP1014-CR
(L.C. No. 2017CM2829)

STATE OF WISCONSIN                    :        IN SUPREME COURT

**State of Wisconsin,**

      **Plaintiff-Respondent,**

  **v.**

**Christopher D. Wilson,**

      **Defendant-Appellant-Petitioner.**

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

**FILED**

**NOV 23, 2022**

Sheila T. Reiff
Clerk of Supreme Court

ANN WALSH BRADLEY, J., delivered the majority opinion for a unanimous Court.

REVIEW of a decision of the Court of Appeals. *Reversed and cause remanded.*

¶1　ANN WALSH BRADLEY, J.　The petitioner, Christopher Wilson, seeks review of an unpublished decision of the court of appeals affirming both his judgment of conviction and the circuit court's denial of his motion to suppress evidence.[1]

---

[1] State v. Wilson, No. 2020AP1014-CR, unpublished slip op. (Wis. Ct. App. May 11, 2021) (affirming the judgment and order of the circuit court for Milwaukee County, David L. Borowski, Judge). The appeal was decided by one judge, Judge M. Joseph Donald, pursuant to Wis. Stat. § 752.31(2)(f) (2017-18).

Wilson argues that his Fourth Amendment rights were violated when police officers entered his fenced-in backyard without a warrant.

¶2 Specifically, Wilson contends that the officers' warrantless entry was not a valid "knock and talk" investigation because the officers lacked an implicit license to enter his fenced-in backyard and therefore the entry violated the Fourth Amendment. He further contends that the officers' warrantless entry was not justified by the exigent circumstance of hot pursuit. The State argues to the contrary, advancing that it had an implicit license to enter and that it was in hot pursuit of Wilson.

¶3 We conclude that the police officers did not conduct a valid "knock and talk" investigation because the officers did not have an implicit license to enter Wilson's backyard. Additionally, we conclude that the officers' entry into Wilson's backyard was not permissible under the exigency of hot pursuit because the officers did not immediately or continuously pursue Wilson from the scene of a crime and therefore violated the Fourth Amendment.

¶4 Accordingly, we reverse the decision of the court of appeals and remand to the circuit court with directions to vacate Wilson's judgment of conviction and grant the motion to suppress evidence.

---

All subsequent references to the Wisconsin Statutes are to the 2017-18 version unless otherwise indicated.

I

¶5 On January 16, 2017, South Milwaukee police received a call from a citizen witness describing a grey BMW driving erratically and traveling "all over the road." The caller provided an address at which the car had stopped and described the driver of the vehicle as wearing a black hat and bright orange shoes. Further, the caller reported that the driver exited the vehicle, climbed onto a fence, reached over the fence to open it, and then entered the yard.

¶6 Officer Nathan Siefert of the South Milwaukee Police Department responded and arrived at the address the caller had given. He testified that upon his arrival he observed a "silver BMW, just as the caller had described, which was parked in the back parking slab partially on a snowbank." The car was running and the back tailgate was open. Officer Siefert ran the car's license plate and discovered that it was not registered to the address at which it was located.

¶7 Next, Officer Siefert telephoned the caller to confirm the information given. They discussed the details of the complaint, including that the car was changing speeds and driving erratically over the course of about three and a half miles and the fact that the caller observed the car pull into the location where Office Siefert eventually found it. Officer Siefert confirmed with the caller that the caller saw a white male wearing bright orange shoes climb onto a fence, reach over the fence, open it, and enter the yard.

¶8 At this point, Officer Siefert testified that he treated the situation as "possibly an OWI and possibly a burglary." Specifically, he "believed that this was a burglary possibly because the vehicle didn't belong anywhere in the area. It was left running. Perhaps for a quick get-away, the tailgate was left open, and due to the description of someone climbing onto the fence and going in."

¶9 The backyard area of the property was surrounded by a high, solid wooden fence that obstructed any view of the yard. When Officer Siefert and his partner arrived, the gate was open, but a large garbage can blocked the entry way. The officers removed the garbage can from their path, walked through the open gate into the backyard, and proceeded to knock on the side door of the unattached garage. At no point prior to entering the property did the officers obtain a warrant.

¶10 Wilson, who was wearing a black cap and bright orange shoes as the caller had described, opened the garage side door. As they conversed, Officer Siefert observed that Wilson had slurred speech and stumbled on the dry, level, concrete garage floor. Wilson also stated that he had taken his prescribed Methadone that day.

¶11 Officer Siefert accompanied Wilson back to the car so Wilson could retrieve his identification. Upon arriving at the vehicle, Officer Siefert observed in plain view a handgun inside the vehicle. Wilson was subsequently found to have a revoked driver's license, and Officer Siefert placed him under arrest. In the course of a pat-down search, Officer Siefert found a

4

prescription pill bottle in Wilson's pocket which was in a name other than Wilson's.

¶12 Wilson ultimately was charged with one count of operating a motor vehicle while intoxicated (OWI) as a second offense,[2] one count of endangering safety by use of a dangerous weapon under the influence of an intoxicant,[3] and one count of possession of a prescription drug without a valid prescription.[4] He subsequently moved to suppress "all statements, physical evidence, blood samples, and any observations obtained by police that were derived from" the police's warrantless entry to the property.

¶13 Specifically, Wilson contended that the officers impermissibly entered the curtilage of his home without a warrant, in violation of the Fourth Amendment. Consequently, he argued that all evidence gathered as a result of the officers' unlawful actions must be suppressed. The evidence included his statements, the suspected prescription drugs, the gun, and the results of a subsequent chemical test of Wilson's blood.

¶14 After a hearing, the circuit court denied Wilson's motion. It concluded that the "warrantless entry into the backyard near Mr. Wilson's garage and the subsequent arrest of Mr. Wilson on the parking slab outside of the garage were justified by exigent circumstances of a hot pursuit of a fleeing

---

[2] Wis. Stat. §§ 346.63(1)(a), 346.65(2)(am)2.

[3] Wis. Stat. § 941.20(1)(b).

[4] Wis. Stat. § 450.11(7)(h).

suspect who had committed jailable offenses." The circuit court cited criminal trespass and burglary as the potential jailable offenses justifying the entry.

¶15 Subsequently, Wilson pleaded guilty to the OWI and endangering safety counts, and the prescription drug count was dismissed and read in, enabling it to be considered at sentencing.[5] He was sentenced to a total of four months in jail.

¶16 Wilson appealed, and the court of appeals affirmed the circuit court's judgment of conviction and denial of the motion to suppress. State v. Wilson, No. 2020AP1014-CR, unpublished slip op. (Wis. Ct. App. May 11, 2021). However, rather than echoing the circuit court's hot pursuit rationale, it determined that the officers' conduct constituted a permissible "knock and talk" investigation, which if lawfully conducted does not implicate the Fourth Amendment. Wilson petitioned for this court's review.

II

¶17 We are called upon to review the court of appeals' decision affirming the circuit court's denial of a motion to suppress. Whether evidence should be suppressed is a question of constitutional fact subject to a two-step inquiry. State v. Reed, 2018 WI 109, ¶51, 384 Wis. 2d 469, 920 N.W.2d 56.

---

[5] A "read-in" crime is one that either is not charged or is dismissed as part of a plea agreement, but that the defendant agrees the circuit court may consider at sentencing, along with the underlying conduct. See Wis. Stat. § 973.20(1g)(b).

¶18 First, we will uphold a circuit court's findings of fact unless they are clearly erroneous. State v. Anderson, 2019 WI 97, ¶20, 389 Wis. 2d 106, 935 N.W.2d 285. A finding of fact is clearly erroneous if it is against the great weight and clear preponderance of the evidence. Id. Second, the application of constitutional principles to those facts presents a question of law that we review independently of the decisions rendered by the circuit court and court of appeals. Id.

III

¶19 We begin our analysis by setting forth principles of Fourth Amendment jurisprudence. This case implicates one of the core constitutional guarantees found in the United States Constitution.[6] The Fourth Amendment guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." "It is axiomatic that the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" Welsh v. Wisconsin, 466 U.S. 740, 748 (1984) (citing United States v. U.S. Dist. Ct. for E. Dist. of Mich., S. Div., 407 U.S. 297, 313 (1972)). "[W]hen it comes to the Fourth Amendment, the home is first among equals. At the

_____

[6] Article I, Section 11 of the Wisconsin Constitution is the counterpart to the Fourth Amendment of the United States Constitution. Wilson makes a single reference to this section in his brief-in-chief. Otherwise, all of his arguments and analyses are based on the Fourth Amendment of the United States Constitution. Accordingly, we address our review based on Fourth Amendment jurisprudence.

Amendment's 'very core' stands 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" Florida v. Jardines, 569 U.S. 1, 6 (2013) (quoting Silverman v. United States, 365 U.S. 505, 511 (1961)).

¶20 Fourth Amendment protections also extend to the curtilage of one's home, the area "immediately surrounding and associated with the home." Oliver v. United States, 466 U.S. 170, 180 (1984); State v. Martwick, 2000 WI 5, ¶26, 231 Wis. 2d 801, 604 N.W.2d 552. The extent and scope of a home's curtilage is determined by four factors:

> [T]he proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by.

United States v. Dunn, 480 U.S. 294, 301 (1987).

¶21 In Florida v. Jardines, 569 U.S. 1, the United States Supreme Court articulated an investigative technique, the "knock and talk," that law enforcement may use in entering one's constitutionally-protected curtilage. A "knock and talk" investigation is not a search but instead is an investigative technique premised on the implicit license that a visitor, or neighbor, would have with regard to entering one's curtilage. See City of Sheboygan v. Cesar, 2010 WI App 170, ¶9 n.5, 330 Wis. 2d 760, 769 N.W.2d 429.

¶22 A warrantless search of a home, on the other hand, is presumptively unreasonable. Payton v. New York, 445 U.S. 573,

8

586 (1980). Nevertheless, this court has recognized that a warrantless home entry is generally lawful if there are exigent circumstances together with probable cause. See State v. Ferguson, 2009 WI 50, ¶19, 317 Wis. 2d 586, 767 N.W.2d 187; State v. Robinson, 2010 WI 80, ¶24, 327 Wis. 2d 302, 786 N.W.2d 463 (quoting State v. Smith, 131 Wis. 2d 220, 228, 388 N.W.2d 601 (1986)) (noting that "in special circumstances, when there is an urgent need coupled with insufficient time to obtain a warrant, 'it would be unrealistic'" to bar a law enforcement officer's entry into a home). In such an exigent circumstance, like hot pursuit, the government bears the burden of showing that the warrantless search was both supported by probable cause and justified by exigent circumstances. Robinson, 327 Wis. 2d 302, ¶24 (emphasis added).

¶23 Wisconsin has recognized four categories of exigent circumstances: (1) hot pursuit of a suspect, (2) a threat to the safety of a suspect or others, (3) a risk that evidence will be destroyed, and (4) a likelihood that the suspect will flee. Id., ¶30. Only the first of these circumstances, hot pursuit, is raised as an issue in this case.

A

¶24 With this framework in mind, we turn next to examine whether the officers had an implicit license to enter Wilson's constitutionally-protected curtilage and conduct a "knock and talk" investigation. There is no dispute here that Wilson's backyard constitutes protected curtilage under the Fourth Amendment.

9

¶25 The test as to whether there exists an invitation or license to approach an individual's home generally does not require extensive legal acumen. "Complying with the terms of that traditional invitation does not require fine-grained legal knowledge; it is generally managed without incident by the Nation's Girl Scouts and trick-or-treaters." Jardines, 569 U.S. at 8. Accordingly, there is a generally recognized implicit license for visitors "to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." Id. Just as an ordinary citizen may approach the curtilage of one's front porch to knock on the door, so may the police without a warrant "precisely because that is 'no more than any private citizen might do.'" Id. (quoting Kentucky v. King, 563 U.S. 452, 469 (2011)).

¶26 The implicit license to approach an individual's home outlined in Jardines is not confined to that individual's front door or front porch. In limited scenarios, it also may extend to an alternative approach to the house or back entryway depending on the facts of a case. There is no blanket implicit license to enter a backyard. Rather, the inquiry is highly fact-specific.

¶27 For example, in Alvarez v. Montgomery County, 147 F.3d 354 (4th Cir. 1998), the Fourth Circuit upheld police officers' entrance into a backyard as a permissible warrantless entry when the officers followed a sign pointing to the backyard. Officers, responding to a complaint of underage drinking, first approached the front door of the Alvarez home before seeing a

10

sign in the driveway that read "Party In Back" with an arrow pointing toward the backyard. Id. at 356-57. The court observed that "in light of the sign reading 'Party In Back' with an arrow pointing toward the backyard, it surely was reasonable for the officers to proceed there directly as part of their effort to speak with the party's host." Id. at 358-59.

¶28 Similarly, in United States v. Garcia, 997 F.2d 1273 (9th Cir. 1993), the Ninth Circuit upheld police officers' warrantless entry into a backyard when the back entrance could be readily believed to be the main, public entrance to the home. The court concluded that a license to enter a home's curtilage applies and the Fourth Amendment is not implicated "when officers go to the back door reasonably believing it is used as a principal entrance to the dwelling." Id. at 1280. There, the police entered the back porch area of a home believing it was the front door of an apartment. The back porch area was "readily accessible from a public place" and could reasonably be believed to be the main, public entrance to the home. Id.

¶29 In applying the test to the facts of this case, we agree with Wilson that the court of appeals erred in determining that the officers conducted a lawful "knock and talk" investigation. See Wilson, No. 2020AP1014-CR, at ¶18. The court of appeals concluded that the officers had an implicit license "to enter the backyard in the middle of the day from the alley, walk to the side garage door, and knock" because the gate was ajar, and therefore "there is no clear indication that visitors were intended to be excluded from entering." Id., ¶23.

11

It further reasoned that the officer's entry was permissible because the officers had reason to believe someone was in the backyard. Id., ¶24.

¶30 We disagree with the court of appeals on both points. Wilson's backyard was surrounded by a tall, solid wooden fence and even though the gate to the backyard was open, it was blocked by a large garbage can. It is hard to believe that a private citizen in the alley would consider Wilson's fence, together with the garbage can impeding the opening in the fence, as an invitation to approach the side door of the unattached garage. If a private citizen does not have an implicit license to do this, neither does law enforcement.

¶31 The facts of Garcia are in stark contrast to the facts of this case. When the officers pulled up to Wilson's alleyway and entered the backyard from the alley in order to knock on the side door of the unattached garage they were not under the impression that they were approaching the front door of Wilson's home. Unlike in Garcia, Wilson's garage door was not "readily accessible from a public place" and could not reasonably be believed to be the main, public entrance to the home. Thus, the officers did not have an implicit license to conduct a "knock and talk" by operation of a well-intentioned, yet mistaken, belief that they were approaching Wilson's main, public entrance. Stated simply, private citizens would not feel they had an implicit license to enter the backyard——and neither would a Girl Scout in the words of the Jardines Court.

12

¶32 The court of appeals cites Alvarez, 147 F.3d 354, to support the proposition that the officers could lawfully enter the backyard without a warrant because the officers believed someone was in the backyard. Wilson, No. 2020AP1014-CR, at ¶24. We do not find this contention persuasive for two reasons. First, the court of appeals interprets Alvarez too broadly. Contrary to the court of appeals' reading, Alvarez does not give a blanket license for officers to enter a backyard, even if they believe someone may be there. Rather, the inquiry is fact-specific. See Alvarez, 147 F.3d at 358.

¶33 Second, the facts in Alvarez are significantly different from those here. Unlike in Alvarez, here there was no sign directing the officers, or any other visitor, to the backyard and there was no indication that a knock on the front door would go unanswered (such as because the homeowner was hosting a party in the back). Nothing indicated that the implicit license to approach the front door to the house here extended to the tall, gated backyard.

¶34 Accordingly, if officers wished to enter the backyard, they needed first to obtain a warrant. We thus conclude that the police officers' "knock and talk" investigation violated Wilson's Fourth Amendment rights because the officers did not have an implicit license to enter Wilson's backyard without a warrant.

B

¶35 Having determined that the police officers' entry was not a "knock and talk" investigation, but a warrantless

13

intrusion that implicated the Fourth Amendment, we turn next to examine whether the exigent circumstances exception to the warrant requirement applies.[7] Although the court of appeals did not address the exigent circumstance of hot pursuit, the circuit court relied on that exception. It concluded that the officers' warrantless entry into Wilson's backyard was justified by the exigent circumstance of hot pursuit.

¶36 As noted above, generally, a warrantless entry must be "supported by probable cause and justified by exigent circumstances." Robinson, 327 Wis. 2d 302, ¶24. The exigent circumstances exception to the warrant requirement applies if the need for a search is urgent and there is insufficient time to obtain a warrant. State v. Dalton, 2018 WI 85, ¶39, 383

---

[7] As a threshold matter, Wilson asserts in his reply brief that the State forfeited any argument that the hot pursuit doctrine applies because it failed to raise the issue in its response to Wilson's petition for review.

Even assuming without deciding that the issue was forfeited, we may still exercise our discretion in addressing it. The forfeiture rule is not an inexorable command, but is instead a rule of judicial administration, and thus a reviewing court may disregard a forfeiture and address the merits of an unpreserved issue in an appropriate case. State v. Counihan, 2020 WI 12, ¶27, 390 Wis. 2d 172, 938 N.W.2d 530. Here, hot pursuit was the rationale explicitly relied upon by the circuit court, so that the State may argue hot pursuit should not have been a surprise to Wilson. In the interest of completeness, we thus choose to address the issue. See D.L. Anderson's Lakeside Leisure Co., Inc. v. Anderson, 2008 WI 126, ¶41, 314 Wis. 2d 560, 757 N.W.2d 803 (addressing a "waived challenge to the jury instructions because that challenge involves important issues that we wish to address").

Wis. 2d 147, 914 N.W.2d 120; see Payton, 445 U.S. at 590; State v. Hughes, 2000 WI 24, ¶17, 233 Wis. 2d 280, 607 N.W.2d 621.

¶37 For the exigency of hot pursuit, "[t]he government bears the burden of showing that the warrantless entry was both supported by probable cause and justified by exigent circumstances." Robinson, 327 Wis. 2d 302, ¶24 (emphasis added); see Welsh, 466 U.S. at 750; Hughes, 233 Wis. 2d 280, ¶17. Given that both prongs of the test must be met, we need not further address probable cause here, because we determine that the State's exigent circumstance argument fails.

¶38 As stated, the hot pursuit of a suspect constitutes an exigency such as to authorize a law enforcement officer's warrantless entry into a home. Robinson, 327 Wis. 2d 302, ¶30. This exigency recognizes that it would impede effective law enforcement to bar officers from a home in instances when there is an urgent need and insufficient time to obtain a warrant. Id., ¶24. The basic ingredient of the exigency of hot pursuit is "immediate or continuous pursuit of [a suspect] from the scene of a crime." State v. Richter, 2000 WI 58, ¶32, 235 Wis. 2d 524, 612 N.W.2d 29. "[S]ome sort of a chase" is required, but it "need not be an extended hue and cry 'in and about (the) public streets.'" United States v. Santana, 427 U.S. 38, 43 (1976).

¶39 The circuit court concluded that the officers' warrantless entry into Wilson's backyard was justified because the officers had probable cause that Wilson had committed jailable offenses and because the exigent circumstance of hot

15

pursuit applies. Thus, we examine whether the facts here support "pursuit" that would justify the officers' warrantless entry.

¶40 The State cites to State v. Richter, 235 Wis. 2d 524, which concluded that a warrantless entry was reasonable under the hot pursuit doctrine.[8] Yet, the facts in Richter are distinguishable from the case at hand. In Richter, the victim of an attempted break-in saw the suspect run into another trailer home, which was then validated by the officers' visual confirmation of broken glass and a window screen lying on the ground.

¶41 As we explained in Richter, the officers' pursuit of the suspect was both immediate and continuous:

> [The officer] responded to a dispatch and picked up the trail of a fleeing suspect from an eyewitness account. His response to the scene of the crime was immediate, and his pursuit of the suspect was immediate and continuous upon his arrival on the scene and rapid collection of information regarding the whereabouts of the suspect. There is no evidence in this record of any delay in [the officer's] response or pursuit that would have interrupted the immediacy and continuity of the situation and therefore dissipated the exigency. We conclude that [the officer's] entry was justified by the exigent circumstance of hot pursuit.

Id., ¶36.

---

[8] State v. Richter, 2000 WI 58, ¶41, 235 Wis. 2d 524, 612 N.W.2d 29, also concluded that the warrantless entry was reasonable under the exigency of a threat to the safety of a suspect or others. This exigency was not raised as an issue in this case and thus we confine our discussion of Richter to the exigency of hot pursuit.

16

¶42 Unlike in Richter, the officers here did not pick up Wilson's trail and immediately pursue Wilson based on the contemporaneous collection of information. Instead, they received a call to go to a particular location. Upon arrival, the officers delayed in order to gather more information. After observing the location, the officers ran the vehicle license plate to obtain vehicle registration information. Next, they contacted the 911 caller to discuss more details of the complaint, including the speed of the vehicle, the nature of the erratic driving, and a description of its three-and-a-half mile route. Additionally, they discussed what the suspect was wearing and his conduct upon exiting the vehicle. Although we do not know the exact amount of time it took the officers to check the vehicle registration and contact the 911 caller, the record does not support the proposition that the officers were acting in hot pursuit. What occurred was neither hot nor was it a continuous pursuit.

¶43 We find further support in Welsh v. Wisconsin, 466 U.S. 740, for our conclusion that the facts here do not constitute hot pursuit. In Welsh, a concerned driver called the police to report an erratic driver who was swerving in the road and eventually stopped in an open field. Id. at 742. The erratic driver got out of his car and approached the concerned citizen, asking him for a ride home. Id. The concerned citizen suggested waiting for assistance but the driver walked away from the field, leaving his car. Id. A few minutes later, officers arrived, checked the registration of the abandoned car, and

17

proceeded to the suspect's home. Id. at 742-43. The United States Supreme Court concluded that "the claim of hot pursuit is unconvincing because there was no immediate or continuous pursuit of the petitioner from the scene of a crime." Id. at 753.

¶44 Similarly here, there was no immediate or continuous pursuit from the scene of the crime. In fact, there was even less of a pursuit than what occurred in Welsh. Police simply received a call telling them to go to a specific address and they went to that location. It was not a real time pursuit of a suspect.

¶45 After receiving the complaint from the 911 caller, the officers drove to the alleyway of Wilson's house. The police did not end up at Wilson's home after following an erratic driver. Wilson was already inside the property when the police arrived.

¶46 When the police arrived, an officer performed a registration check on Wilson's car and then called the citizen witness to gather more information. The officer discussed with the caller details of Wilson's erratic driving, the streets on which he had driven, and how many miles of driving the witness observed. Additionally, they discussed the details of Wilson's entry into his backyard and what he was wearing. As discussed above, the attenuation reflected by these activities does not support a hot pursuit conclusion.

¶47 Hot pursuit requires "some sort of a chase," and such an event did not occur here. See Santana, 427 U.S. at 43.

18

Welsh further instructs that the pursuit must be immediate and continuous. Welsh, 466 U.S. at 753. Simply put, police did not "pursue" Wilson to his home. Thus, there was no "pursuit," much less a "hot" pursuit, which would justify the hot pursuit exception to the warrant requirement.

IV

¶48 In sum, we conclude that Wilson's Fourth Amendment rights were violated. The police officers' warrantless entry into Wilson's backyard was not a valid "knock and talk" investigation because they did not have an implicit license to enter nor did their entry satisfy the hot pursuit exception to the warrant requirement. Accordingly, we reverse the decision of the court of appeals and remand the cause to the circuit court with directions to vacate Wilson's judgment of conviction and grant the motion to suppress.

*By the Court.*—The decision of the court of appeals is reversed, and the cause is remanded to the circuit court.