**COURT OF APPEALS**
**DECISION**
**DATED AND FILED**

**January 13, 2026**

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2024AP998**

STATE OF WISCONSIN

Cir. Ct. No. 2023CV27

IN COURT OF APPEALS
DISTRICT III

STEPHAN LANE,

PLAINTIFF-RESPONDENT,

V.

RILEY KUMMET AND ZACK DIECKMAN,

DEFENDANTS-APPELLANTS,

RUSK COUNTY,

DEFENDANT.

APPEAL from an order of the circuit court for Rusk County: BENJAMIN J. LANE, Judge. *Affirmed and cause remanded for further proceedings*.

Before Stark, P.J., Hruz, and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1      PER CURIAM. Riley Kummet and Zack Dieckman appeal a nonfinal order denying their motion for summary judgment on claims brought against them by Stephan Lane.  On appeal, Kummet and Dieckman contend that they are entitled to qualified immunity on Lane's claim against them under 42 U.S.C. § 1983.[1]  Like the circuit court, we conclude that genuine issues of material fact exist regarding Kummet and Dieckman's entitlement to qualified immunity.  We therefore affirm the order denying summary judgment on that issue and remand for further proceedings consistent with this opinion.

## BACKGROUND

¶2      In January 2021, both Kummet and Dieckman were employed as investigators with the Rusk County Sheriff's Office.  At that time, the Rusk County Sheriff's Office was investigating reports regarding a marijuana grow operation at Lane's residence, which was located on Fritz Avenue in Ladysmith, Wisconsin.

¶3      As part of that investigation, on January 11, 2021, Kummet and Dieckman performed a "knock and talk" at Lane's residence.  A "knock and talk" is an investigative technique in which

---

[1] On June 28, 2024, this court granted Kummet and Dieckman's petition for leave to appeal the circuit court's nonfinal order "as to the limited issue of whether the circuit court erred by denying [Kummet and Dieckman's] motion for summary judgment on the issue of qualified immunity."  *See* WIS. STAT. RULE 809.50(3) (2023-24); *see also **Arneson v. Jezwinski**, 206 Wis. 2d 217, 231, 556 N.W.2d 721 (1996).

All references to the Wisconsin Statutes are to the 2023-24 version.

> police go to people's residences, with or without probable cause, and knock on the door to obtain plain views of the interior of the house, to question the residents, to seek consent to search, and/or to arrest without a warrant, often based on what they discover during the "knock and talk."

*City of Sheboygan v. Cesar*, 2010 WI App 170, ¶9 n.5, 330 Wis. 2d 760, 796 N.W.2d 429 (citation omitted).

¶4 Lane's residence had a front door on the northern side of the house—that is, the side of the house facing Fritz Avenue. There was also a door on the back, southern side of the house, leading into a structure that the parties refer to as a "breezeway." The breezeway had two windows on its south wall and had siding matching the rest of the house. The backyard area surrounding the breezeway on the southern side of the house was enclosed with a fence, which had a gate with a latch. There was a parking area to the west of the house, outside the fenced-in backyard on the south side of the residence.

¶5 When Kummet and Dieckman went to Lane's residence to perform a "knock and talk," they approached the southern door leading into the breezeway, rather than the front door on the north side of the house. They entered the fenced area on the south side of the residence through the gate, which they stated was latched, but not locked. They then proceeded into the breezeway and made their way to a closed door leading into the house, which had a Ring doorbell on it. After Kummet rang the doorbell, Lane opened the door leading from the breezeway into the house. At that point, Kummet could smell marijuana, and he also saw three planter pots inside the house that "had large stems that appeared to be marijuana already harvested." Lane quicky shut the door behind him and then walked outside of the breezeway, into the backyard, to speak with Kummet and Dieckman.

¶6      Based in part on his observations during the "knock and talk," Kummet subsequently applied for—and received—a warrant to search Lane's residence. During the execution of the search warrant, officers seized "THC plants that smelled of raw marijuana," plantlike material that field-tested positive for THC, and other drug-related items. The State then charged Lane in Rusk County Case No. 2021CF24 with manufacture or delivery of THC, possession with intent to deliver THC, misdemeanor bail jumping, and possession of drug paraphernalia.

¶7      In his criminal case, Lane moved to suppress the evidence seized during the search of his residence, arguing that Kummet and Dieckman conducted an unlawful, warrantless search within the curtilage of his home when they entered the home's breezeway to perform a "knock and talk." Following a suppression hearing, the State conceded that Kummet and Dieckman had unlawfully entered the curtilage of Lane's home without a warrant and that the subsequent search warrant was issued based on information obtained during the prior, unlawful search. The State therefore joined Lane's motion to suppress. The circuit court in Lane's criminal case granted the suppression motion and dismissed the charges against Lane.

¶8      Lane then filed the instant lawsuit against Kummet, Dieckman, and Rusk County, asserting a claim under 42 U.S.C. § 1983 based on Kummet and Dieckman's alleged violation of Lane's rights under the Fourth Amendment to the

United States Constitution and article 1, section 11 of the Wisconsin Constitution.[2] Lane also asserted state law claims for trespass and invasion of privacy. In addition, he alleged that Rusk County was liable for Kummet and Dieckman's actions under the doctrine of respondeat superior.

¶9 Kummet, Dieckman, and Rusk County moved for summary judgment, arguing that: (1) Lane's § 1983 claim failed as a matter of law because the undisputed facts showed that Kummet and Dieckman did not violate Lane's constitutional rights (2) alternatively, Kummet and Dieckman were entitled to qualified immunity with respect to the § 1983 claim; (3) Lane's state law claims failed as a matter of law; (4) alternatively, Kummet and Dieckman were entitled to governmental immunity with respect to the state law claims, pursuant to WIS. STAT. § 893.80(4); and (5) Rusk County was not liable for Lane's state law claims under the doctrine of respondeat superior. Lane filed a response opposing the summary judgment motion, and both sides filed affidavits in support of their respective positions.

¶10 With respect to Lane's § 1983 claim, the circuit court concluded that genuine issues of material fact existed as to whether Kummet and Dieckman had violated Lane's constitutional rights and whether they were entitled to qualified immunity for any such violation. The court further concluded that genuine issues of material fact existed regarding Lane's state law claims. The court therefore denied the defendants' motion for summary judgment with respect to those issues.

---

[2] Both the Fourth Amendment to the United States Constitution and article 1, section 11 of the Wisconsin Constitution "provide protection from unreasonable searches and seizures." *State v. Sykes*, 2005 WI 48, ¶13, 279 Wis. 2d 742, 695 N.W.2d 277. "Historically, we follow the United States Supreme Court's interpretations when construing both constitutions' search and seizure provisions." *Id.*

¶11 However, the circuit court ordered the parties to file supplemental briefs regarding Kummet and Dieckman's entitlement to governmental immunity for Lane's state law claims under WIS. STAT. § 893.80(4). Additionally, the court concluded that Rusk County could not be held liable under the doctrine of respondeat superior for the intentional torts of its employees, and it therefore granted Rusk County summary judgment with respect to Lane's state law claims. Following supplemental briefing, the court concluded that Kummet and Dieckman were immune from Lane's state law claims under § 893.80(4), and it granted Kummet and Dieckman summary judgment on those claims.

¶12 Kummet and Dieckman now appeal, arguing that the circuit court erred by denying their motion for summary judgment on the issue of their entitlement to qualified immunity for Lane's § 1983 claim.[3] *See supra* note 1.

## DISCUSSION

¶13 We independently review a grant or denial of summary judgment, using the same methodology as the circuit court. *See* ***Hardy v. Hoefferle***, 2007

---

[3] We pause to note that Kummet and Dieckman's appellate briefs are deficient in two respects. First, they do not comply with WIS. STAT. RULE 809.19(8)(bm), which requires a brief to "have page numbers centered in the bottom margin using Arabic numerals with sequential numbering starting at '1' on the cover." Our supreme court has explained that this pagination requirement "will match the page number to the page header applied by the eFiling system, avoiding the confusion of having two different page numbers." S. CT. ORDER 20-07, 2021 WI 37, 397 Wis. 2d xiii (eff. July 1, 2021).

Second, many of the factual assertions in Kummet and Dieckman's brief-in-chief are unsupported by appropriate references to the record, as required by WIS. STAT. RULE 809.19(1)(d)-(e). Instead, Kummet and Dieckman support these factual assertions with citations to their brief's appendix. An appendix, however, is not the record. *See* ***United Rentals, Inc. v. City of Madison***, 2007 WI App 131, ¶1 n.2, 302 Wis. 2d 245, 733 N.W.2d 322.

We admonish Kummet and Dieckman's counsel that future violations of the Rules of Appellate Procedure may result in sanctions. *See* WIS. STAT. RULE 809.83(2).

WI App 264, ¶6, 306 Wis. 2d 513, 743 N.W.2d 843. Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." WIS. STAT. § 802.08(2).

¶14 "Summary judgment is a drastic remedy; therefore, the moving party must clearly be entitled to judgment as a matter of law." *CED Props., LLC v. City of Oshkosh*, 2018 WI 24, ¶19, 380 Wis. 2d 399, 909 N.W.2d 136 (citation omitted). When reviewing a summary judgment decision, we view the facts in the light most favorable to the nonmoving party, and any doubts as to whether a genuine issue of material fact exists must be resolved against the moving party. *Id.* "Should the material presented on the motion be subject to conflicting interpretations or if reasonable people might differ as to its significance, then summary judgment must be denied." *Oddsen v. Henry*, 2016 WI App 30, ¶26, 368 Wis. 2d 318, 878 N.W.2d 720.

¶15 Here, the circuit court denied Kummet and Dieckman's motion for summary judgment on the issue of qualified immunity. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citation omitted).

> Determining whether a defendant state officer is entitled to qualified immunity involves two inquiries: "(1) whether the facts, taken in the light most favorable to the plaintiff, make out a violation of a constitutional right, and (2) whether that constitutional right was clearly established at the time of the alleged violation."

*Gibbs v. Lomas*, 755 F.3d 529, 537 (7th Cir. 2014) (citation omitted). "If *either* inquiry is answered in the negative, the defendant official is entitled to summary judgment." *Id.* However, "[i]f there are disputed material facts—facts on which the issue of qualified immunity turns—then … the case [must] proceed to trial on that and other issues." *Baxter v. DNR*, 165 Wis. 2d 298, 311, 477 N.W.2d 648 (Ct. App. 1991); *see also Burkes v. Klauser*, 185 Wis. 2d 308, 329, 517 N.W.2d 503 (1994) ("If issues of fact preclude granting the shelter of qualified immunity, the case should proceed to trial on the merits.").

¶16 In this case, we conclude that the circuit court properly denied Kummet and Dieckman's motion for summary judgment on the issue of qualified immunity because genuine issues of material fact exist as to both prongs of the qualified immunity analysis.

¶17 As to the first prong, there are material factual disputes that prevent us from concluding, as a matter of law, whether Kummet and Dieckman's warrantless entry into the breezeway of Lane's home violated Lane's Fourth Amendment rights. "It is axiomatic that the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" *Welsh v. Wisconsin*, 466 U.S. 740, 748 (1984) (citation omitted). The Fourth Amendment's protection extends to the home's curtilage, which is the area "immediately surrounding and associated with the home." *State v. Cundy*, 2023 WI App 41, ¶19, 409 Wis. 2d 34, 995 N.W.2d 266 (citation omitted). "Under the Fourth Amendment, warrantless searches inside a home or its curtilage are presumptively unreasonable and unlawful." *State v. Ionescu*, 2019 WI App 68, ¶9, 389 Wis. 2d 586, 937 N.W.2d 90 (footnote omitted).

¶18 Kummet and Dieckman do not dispute that the breezeway of Lane's home is part of the home's curtilage. In fact, they assert that the breezeway is "[i]ndisputably" curtilage. They contend, however, that their entry into the breezeway and their subsequent contact with Lane did not constitute an impermissible warrantless search within the curtilage of Lane's home. Instead, they argue that they conducted a permissible "knock and talk" under *Florida v. Jardines*, 569 U.S. 1 (2013).

¶19 In *Jardines*, the United States Supreme Court considered whether the use of a drug-sniffing dog on a homeowner's porch to investigate the contents of the home was a "search" within the meaning of the Fourth Amendment. *Id.* at 3. In addressing that issue, the Court noted that the homeowner's porch fell within the home's curtilage and that it was undisputed the officers and canine had entered the curtilage. *Id.* at 7. Accordingly, the "only question" was whether the homeowner "had given his leave (even implicitly) for them to do so." *Id.* at 8. In answering that question, the Court explained that

> "[T]he knocker on the front door is treated as an invitation or license to attempt an entry, justifying ingress to the home by solicitors, hawkers and peddlers of all kinds." This implicit license typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave. Complying with the terms of that traditional invitation does not require fine-grained legal knowledge; it is generally managed without incident by the Nation's Girl Scouts and trick-or-treaters. Thus, a police officer not armed with a warrant may approach a home and knock, precisely because that is "no more than any private citizen might do."

*Id.* (citations and footnote omitted).

¶20    Thus, the ***Jardines*** Court recognized that law enforcement may enter the constitutionally protected curtilage of a home in order to perform a "knock and talk," which is "not a search but instead is an investigative technique premised on the implicit license that a visitor, or neighbor, would have with regard to entering one's curtilage." ***State v. Wilson***, 2022 WI 77, ¶21, 404 Wis. 2d 623, 982 N.W.2d 67.  In ***Wilson***, our state supreme court recognized that "[t]he implicit license to approach an individual's home outlined in ***Jardines*** is not confined to that individual's front door or front porch," and "[i]n limited scenarios, it also may extend to an alternative approach to the house or back entryway depending on the facts of a case." ***Id.***, ¶26.  However, "[t]here is no blanket implicit license to enter a backyard.  Rather, the inquiry is highly fact-specific." ***Id.***

¶21    Kummet and Dieckman argue that under the undisputed facts of this case, they had an implicit license to enter the curtilage of Lane's home—i.e., the breezeway—in order to perform a "knock and talk."  Lane, however, asserts that there are genuine issues of material fact as to whether Kummet and Dieckman had an implicit license to enter the breezeway.  We agree with Lane that genuine issues of material fact exist regarding that issue.[4]

¶22    Both Kummet and Dieckman submitted affidavits in support of their summary judgment motion.  In his affidavit, Kummet averred that prior to the

---

[4] In the alternative, Lane asserts that the breezeway was not merely part of his home's curtilage but was actually part of the home itself.  Based on this premise, Lane contends that "a reasonable officer would have known [that] entering [the breezeway] without a warrant violated the Fourth Amendment."  However, Lane cites only a single, unpublished case in support of his claim that the breezeway was part of the home itself. *See **State v. Basler***, No. 2018AP2299-CR, unpublished slip op. (WI App May 15, 2019).  This single citation to an unpublished case is insufficient to show that it was "clearly established" at the time of the alleged violation that the breezeway was part of Lane's home, rather than part of the home's curtilage. *See **Gibbs v. Lomas***, 755 F.3d 529, 537 (7th Cir. 2014) (citation omitted).

"knock and talk," he "conducted multiple drive-bys" of Lane's residence and "did not observe any foot traffic to the northern door on Fritz Avenue." Kummet further averred that the northern door "did not appear to be used by anyone," that "all foot traffic and tracks [were] at the southern door on the breezeway," and that "all vehicle tracks and parking for the residence [were] at the parking area near this southern door, just outside the west side of the fence." Both Kummet and Dieckman also averred that prior to performing the "knock and talk," they consulted with officers from the Ladysmith Police Department, who stated they had previously made contact with Lane at the southern door of his residence.

¶23 Kummet further averred that when he and Dieckman arrived at Lane's residence to perform the "knock and talk," the door on the north side of the residence "appeared unkempt—there was no indication of foot traffic in the snow in the walkway leading up to the door and the snow did not appear shoveled during [the] multiple previous drive-bys." In contrast, Kummet averred that there were "signs of significant foot traffic in the snow from the parking area" on the west side of the residence "through the gate [into the fenced yard] and into the breeze way." Dieckman similarly averred that there were "clear tracks and signs of foot traffic into the fence area and to the southern open doorway on the breezeway, indicating to me this was a main thoroughfare for foot traffic at this residence." Dieckman also averred that the parking area along the fence "appeared well-used and shoveled for or used by multiple vehicles."

¶24 According to Dieckman, the fence surrounding the yard on the south side of Lane's residence "was latched but not locked" when he and Kummet arrived to perform the "knock and talk." Kummet agreed that the fence gate was not locked. Dieckman averred that the fence appeared to be "erected for

11

containing dogs on the property versus erected for keeping people out or for privacy."

¶25    Both Kummet and Dieckman averred that the exterior door of the breezeway was open when they approached the home, and it appeared to be "nonfunctional" or broken. Kummet also averred that the breezeway door had been open during his previous drive-bys of the residence. Kummet and Dieckman averred that they entered the breezeway through its open door and approached the door leading from the breezeway into Lane's residence. That second door was closed and had a Ring doorbell on it, which was pointed toward the breezeway's entrance. Kummet and Dieckman averred that based upon their observations, they believed that the closed door leading from the breezeway into the residence was the "door to the residence where one would approach to knock or ring the doorbell to get Lane to come to the door."

¶26    In summary, according to Kummet and Dieckman, when they approached Lane's residence to perform the "knock and talk," they knew that: (1) law enforcement had previously made contact with Lane at the southern door of his residence; (2) the sidewalk leading to the residence's northern door was not shoveled either that day or during previous drive-bys; (3) there were signs of significant foot traffic leading from the parking area on the west side of the residence, through the fence, and to the southern door leading into the breezeway; (4) the fence gate was not locked; (5) the breezeway door was open and nonfunctional; and (6) the door leading from the breezeway to the interior of the residence was closed and had a Ring doorbell on it. These facts, if believed by a factfinder, could support a determination that Kummet and Dieckman had an implicit license to enter the breezeway in order to make contact with Lane, as any private citizen might similarly do when approaching Lane's residence.

¶27     The facts summarized above, however, are not entirely undisputed. In his affidavit in opposition to summary judgment, Lane averred that the door on the northern side of his residence is the home's primary entrance and "clearly appears that way," as it bears a mailbox, the house number, and his name. Lane further averred that he regularly shovels the walk leading to the northern door, "as it is off the city public sidewalk and [he] would receive a ticket if [he] did not shovel." According to Lane, the walk leading to the northern door was shoveled on the day that Kummet and Dieckman performed the "knock and talk." Lane further averred that his mail is delivered to the residence's northern door; that visitors and solicitors (if any) use that door; and that if anyone had asked him how to knock at his door, he would have directed them to the northern door. Lane's affidavit states, "It was my intent [to], and I believe that I did, make clear to any reasonable person visiting my home that the shoveled front steps, off the city sidewalk, where the house number, my name, and the mailbox [were] located was the primary entrance."

¶28     Unlike the northern door of his residence, Lane averred that the southern door leading into the breezeway is "not directly off of any public sidewalk or road." Lane further averred that one of the reasons he installed a fence around the yard on the south side of his residence was for "privacy." He averred that he kept the fence's gate latched "to discourage or deter people from entering"; that he kept a padlock on the gate that was locked when he was not home; and that when he was home, he did not lock the padlock but left it "hanging on the gate/latch to show [his] intent that this was a private area."

¶29     Lane also averred that there is a functional door leading into the breezeway of his home, which was closed at the time Kummet and Dieckman approached his residence to perform the "knock and talk." Lane averred that there

is a padlock on the breezeway's door, which he keeps unlocked when he is home so that he can exit in the event of an emergency, "[b]ut [the padlock] hangs there so others will see [that the breezeway] is not open to the public." Lane further averred that he stores personal property in the breezeway and that he "fully intended that people would not pass that southern-most doorway, open or closed."

¶30 The aforementioned facts, if accepted as true, would support a determination that Kummet and Dieckman did not have an implicit license to enter the breezeway to knock on the door of Lane's home because a private citizen—such as a Girl Scout or trick-or-treater—would not have had a license to do so under these circumstances. As Lane aptly explains, accepting his version of the facts as true,

> Would a Girl Scout approaching Mr. Lane's house to sell cookies bypass the front door, off the public sidewalk, with the house number and mailbox, and go around to the backyard, through the latched gate and fence with a padlock hanging there, open the closed breezeway door, also with a padlock hanging there, cross through the breezeway and then knock on that door? The answer is clearly, and objectively, no.

¶31 Absent an implicit license to enter the curtilage of Lane's home—i.e., the breezeway—to knock on Lane's door, Kummet and Dieckman's warrantless entry into the curtilage violated Lane's rights under the Fourth Amendment. Consequently, "the facts, taken in the light most favorable to [Lane], make out a violation of a constitutional right." *See Gibbs*, 755 F.3d at 537 (citation omitted).

¶32 Turning to the second prong of the qualified immunity analysis, the factual disputes outlined above also preclude a determination, as a matter of law, as to whether the constitutional right at issue was "was clearly established at the

14

time of the alleged violation." *See **id.*** (citation omitted); *see also **Penterman v. Wisconsin Elec. Power Co.***, 211 Wis. 2d 458, 471, 565 N.W.2d 521 (1997) (explaining that, for purposes of the second prong of the qualified immunity analysis, "the test is whether the law was clear in relation to the specific facts confronting the defendant at the time of his action"). We agree with Lane that at the time of Kummet and Dieckman's actions in this case, the limits of a permissible "knock and talk" were well established pursuant to ***Jardines***, which clearly required Kummet and Dieckman to "restrict their movements on private property to those places where visitors could be expected to go." *See **Jardines***, 569 U.S. at 8. Due to the factual disputes summarized above, it is impossible to determine, at present, whether the breezeway constituted an area where visitors could be expected to go. These factual disputes must therefore be resolved before a determination on the second prong of the qualified immunity analysis can be made.[5]

¶33 In support of their argument that the constitutional right at issue in this case was not clearly established at the time of the alleged violation, Kummet and Dieckman rely primarily on ***Alvarez v. Montgomery County***, 147 F.3d 354 (4th Cir. 1998). There, law enforcement arrived at the Alvarezes' home to investigate a complaint regarding an underage drinking party. ***Id.*** at 356-57. As one officer approached the front door of the home, another officer noticed a sign affixed to a lamppost in the driveway that read "Party In Back," with an arrow

---

[5] Kummet and Dieckman assert that Lane has cited "no case that would have clearly established that [Kummet and Dieckman's] conduct on the night in question … violated [Lane's] Fourth Amendment rights." We disagree, as Lane has cited ***Florida v. Jardines***, 569 U.S. 1 (2013), which clearly established the bounds of a permissible "knock and talk." The issue of whether Kummet and Dieckman's conduct fell within those bounds cannot be resolved on the existing record, due to the material factual disputes summarized above.

pointing toward the backyard. *Id.* at 357. The officers then entered the backyard, without knocking on the home's front door, and found evidence of underage drinking, which led to the issuance of a citation against the Alvarezes' son. *Id.* at 357.

¶34 The Alvarezes sued the officers, asserting that their warrantless entry into the Alvarezes' backyard violated the Fourth Amendment. *Id.* On appeal, the United States Court of Appeals for the Fourth Circuit rejected the Alvarezes' proposed rule "requiring police under all circumstances to knock at the front door before attempting to contact the occupant elsewhere on the premises." *Id.* at 358. The court explained that reasonableness is the touchstone of a Fourth Amendment analysis, and "[i]n line with this reasonableness approach, this circuit has permitted law enforcement officers to enter a person's backyard without a warrant when they have a legitimate law enforcement purpose for doing so." *Id.* The court then determined that the officers' entry into the Alvarezes' backyard was reasonable because they had a legitimate law enforcement purpose for approaching the residence—i.e., investigating a complaint regarding an underage drinking party—and "in light of the sign reading 'Party In Back' with an arrow pointing toward the backyard, it surely was reasonable for the officers to proceed there directly as part of their effort to speak with the party's host." *Id.* at 358-59.

¶35 Kummet and Dieckman assert that like the officers in *Alvarez*, they had a legitimate law enforcement purpose for entering Lane's property—namely, investigating reports that Lane had been growing and distributing marijuana. Thus, Kummet and Dieckman contend that it was not clearly established at the time of the entry that their actions violated the Fourth Amendment.

16

¶36 We reject this argument because *Alvarez* is materially distinguishable from the instant case in at least two ways. First, in *Alvarez*, the court concluded that it was reasonable for the officers to enter the Alvarezes' backyard without first knocking on the front door based, in part, on the sign reading "Party In Back" with an arrow pointing toward the backyard. No similar sign was present in this case directing visitors into Lane's backyard or breezeway. Second, *Alvarez* involved an entry into a home's backyard, not an entry into an enclosed breezeway attached to a home. Nothing in *Alvarez* would have supported a reasonable belief by Kummet and Dieckman that they could enter Lane's breezeway, as opposed to his backyard, without a warrant simply because they had a legitimate law enforcement purpose for doing so. *See Chan v. Wodnicki*, 123 F.3d 1005, 1008 (7th Cir. 1997) (explaining that an official is entitled to qualified immunity "if, at the time he acted, he reasonably could have determined that his actions did not violate clearly established law").

¶37 Citing *Wilson*, Kummet and Dieckman also note that "the Fourth Amendment is not implicated 'when officers go to the back door reasonably believing it is used as a principal entrance to the dwelling.'" *Wilson*, 404 Wis. 2d 623, ¶28 (citation omitted). Kummet and Dieckman then assert that "[t]he record is replete with support for [their] reasonable belief that Lane's southern door was used as a principal entrance to his residence." This argument, however, rests entirely on Kummet and Dieckman's averments regarding the factual circumstances surrounding their entry into the breezeway, and it completely ignores the material factual disputes summarized above. In light of those factual disputes, this court cannot determine, as a matter of law, whether it was reasonable

17

for Kummet and Dieckman to believe that the southern door leading into the breezeway was the principal entrance to Lane's residence.[6]

¶38 Finally, Kummet and Dieckman assert that "whether a public official is entitled to qualified immunity is a question of law for the court—not a determination of fact for the jury." Accordingly, Kummet and Dieckman contend that "this Court (or the Circuit Court on remand) is to decide the question of whether [Kummet and Dieckman] are entitled to qualified immunity based on the undisputed facts." As discussed above, however, the material facts *are* disputed, which prevents either this court or the circuit court from determining, as a matter of law, whether Kummet and Dieckman are entitled to qualified immunity. As already noted, if there are disputed material facts on which the issue of qualified immunity turns, then "the case [must] proceed to trial on that and other issues." *See **Baxter***, 165 Wis. 2d at 311; *see also **Burkes***, 185 Wis. 2d at 329.

¶39 For these reasons, we affirm the circuit court's order denying Kummet and Dieckman summary judgment on the issue of qualified immunity with respect to Lane's § 1983 claim. We remand this matter to the circuit court for further proceedings consistent with this opinion.

---

[6] Kummet and Dieckman assert that any factual disputes are not "material" because "determining whether [Kummet and Dieckman] are entitled to qualified immunity hinges on what [they] reasonably believed at the time—even if those reasonable beliefs were mistaken." (Formatting altered.) However, determining the reasonableness of Kummet and Dieckman's alleged belief that the southern door was the main entrance to Lane's residence requires the resolution of factual disputes, such as whether the walkway leading to the northern door was shoveled and whether the door to the breezeway was closed and/or functional.

*By the Court.*—Order affirmed and cause remanded for further proceedings.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.